[No. 23823.   Department  Two.   December 21, 1932.]

NATIONAL GROCERY COMPANY, *Respondent*, v. PRATT-LOW PRESERVING COMPANY, *Appellant.*[1]

*Kerr & McCord,* for appellant.

*Bronson, Jones & Bronson,* for respondent.

[1]Reported in 17 P. (2d) 51.

STEINERT, J.—This action was brought by plaintiff to recover damages for loss alleged to have been sustained by it by reason of the inferior size and quality of a shipment of prunes purchased from defendant.

Respondent is engaged in the wholesale grocery business in the city of Seattle. Appellant operates a canning industry in Santa Clara, California. Respondents had purchased canned goods, for resale, from appellant over a period of years prior to the purchase of this particular shipment. At one time the amount of business transacted between the parties had ranged between thirty and forty thousand dollars. In August, 1929, respondent was in the market for an order of high-grade prepared, or preserved prunes, and accordingly, its representative, Mr. Allen, took the matter up with a Mr. Goebel of Goebel-Pratt Co., general merchandise brokers, and the exclusive sales agent and representative of appellant in the Seattle territory.

In order that the transaction, from its inception to its conclusion, may be better understood by the reader, we will at this point digress for a moment from a statement of the case to explain certain trade terms that appear in the contract and other written instruments in the record. The term "Santa Clara French prunes" has reference to prunes from the Santa Clara valley in California, in their dried condition. Practically all of the commercial crop of this fruit is handled in the dried form. About two per cent, or less, according to the evidence, are canned as "prepared prunes," which are prunes that are first dried and then stewed in a sugar syrup and finally sealed in cans. A dried prune, when so processed and preserved, will absorb a certain amount of the surrounding syrup, resulting in the inflation of its size and the increase of its weight. In its dried form, the fruit is graded as

to size by the number of prunes necessary to make a pound; thus, 40-50 prunes are such as will require from forty to fifty to weigh a pound; 70-80 prunes will require from seventy to eighty to weigh a pound; the figures indicate the spread in numbers that are required to produce a pound in weight. Owing to its absorbent capacity, the 70-80 dried prune will process into a 40-50 prepared prune.

To determine the class or grade of the prune after it has been sealed in cans, it is necessary to cut the container, draw off the syrup and count the number then necessary to constitute a pound in weight. This process is referred to as the *"cut-out count."* A smaller prune, of 70-80 size in its dried state, will, when preserved, have a cut-out count of 40-50; a prune of 40-50 size in its dried state will process to a cut-out count of 20-30. The term "20° sugar" means that the syrup must test not less than twenty per cent sugar when the prunes are canned. The expression "6-10s," appearing in the written instruments hereinafter referred to, means that the prunes are to be hermetically sealed in No. 10 cans, each holding approximately a gallon, packed six to the case.

We now resume our statement. When respondent's representative, Mr. Allen, began to negotiate with appellant's sales agent, Goebel-Pratt Co., he desired to obtain 40-50 sized prunes, in their dried state, to be preserved in 20° syrup. No mention of any cut-out count was made at the time by either Mr. Allen or Mr. Goebel. The latter quoted a price of $7.05 per dozen cans, which was acceptable to the prospective buyer. Thereupon, Goebel-Pratt Co. wired to appellant as follows:

"Book National three hundred cases tens forty fifty Santa Claras in twenty degree syrup fibre cases seven five fob dock Would like shipment to March first but

believe be satisfied to January first Wire confirmation (Signed) Goebel-Pratt Co.''

It will be noted that no mention of cut-out count was made in the telegram. On the next day, August 15, 1929, Goebel-Pratt Co. received the following wire from appellant:

''Yours fourteenth confirm National three hundred prunes forty fifty cut out count twenty degree syrup split shipment to January first Since will prepare to order extra early shipping instructions necessary each lot Advise labels stop Think our freestone offer good opportunity National secure profitable line (Signed) Pratt-Low Pres. Co.''

It will be noted that the phrase ''cut-out count'' is here mentioned. The wording of this confirmatory telegram, therefore, contains the seed of the subsequent differences between the parties, ultimately resulting in this lawsuit. In this connection, it may be said that Mr. Goebel, testifying for the respondent, stated that the phrase ''cut-out count'' in appellant's telegram meant nothing to him at the time; that he had sold prunes for thirty years, but always in the dried form. In any event, this confirmatory telegram never came to the attention of the respondent.

On the same day, August 15, 1929, following the receipt by Goebel-Pratt Co. of appellant's telegram, respondent gave to Goebel-Pratt Co. a requisition, made out on the latter's form, for the purchase of a shipment of ''300 cs. 40-50s Santa Clara French dried prunes in syrup 6-10s 7.10 doz., to be packed in 20° syrup.'' At the same time, a memorandum of sale, which is in the nature of an order for the goods, was prepared by Goebel-Pratt Co., and a copy sent to each of the parties to this action. The memorandum described the subject matter as ''300 cs. 6-No. 10 40-50 Santa Clara French prunes 7.05 (fibre cases) (in 20°

syrup)," and at the bottom contained the following typewritten notation, "Conf. wire received 8-15-29 from seller."

On the same day, August 15, 1929, a formal contract was made out by Goebel-Pratt Co. on appellant's typewritten form, and was ultimately signed by both parties. The contract described the merchandise as "40-50s in 20° syrup Santa Clara French prunes 7.05 per doz fibre cases." We call attention to the fact that in none of these written instruments is there any specific mention of "cut-out count," except in the preliminary confirmatory telegram of appellant to Goebel-Pratt Co. under date of August 15, 1929. We emphasize this particularly with respect to the formal contract itself. The record also discloses that, upon receipt of the seller's copy of the contract, the appellant, on August 30, 1929, wrote to Goebel-Pratt Co. as follows:

"We acknowledge receipt of our copy of National Grocery contract of August 15th which you sent us attached to your letter of August 27th. Since they have retained their copy without our signature or OK we think you should make certain that their copy carries the changes shown on our copy: 'shipments as needed to Jan. 1st' rather than July 1st, 1930 as originally typed on the contract; price $7.05 rather than $7.10 as originally priced on the contract. Regular label allowance should be on their copy and the clause 'Stewed Prunes guaranteed against swells for three months only' should also show on their copy. We are taking all of these precautions in order to avoid any conflicts or misunderstandings later. Will you please see that buyer is fully advised?

"Yours very truly,
"PRATT-LOW PRESERVING Co.
"Per L. J. Hanchett."

We call attention to this letter because specific changes are suggested therein by appellant regarding

a number of details of the contract, but no mention is made that the term "cut-out count" should be, or had been, added; nor was it in fact added. The formal contract contained on its back, closely typewritten, but above the signatures of the parties, a statement of the terms and conditions under which the goods were sold, including the following: "CLAIMS: Claims other than for swells must be presented within ten (10) days from receipt of goods."

The goods were subsequently shipped, and were received early in March, 1930. They were not, however, 40-50 dried prunes, but were of the 70-80 grade, preserved in syrup; in other words, due to their absorption of syrup the 70-80 prunes in their dried state had processed to 40-50 prunes cut-out count. This fact is not disputed. It is asserted by the respondent and admitted by the appellant.

After some of the goods had been sold by respondent to various retail grocers, complaints began coming in with respect to the size of the prunes. This was sometime in April, 1930, and after the time fixed in the contract for making claims had expired. Upon receipt of the complaints, respondent cut some of the cans and found that the prunes were smaller than what the order called for, and also that they presented a mushy appearance, as though they had been overprocessed. The respondent at once notified Goebel-Pratt Co. of these defects. Mr. Goebel immediately came to respondent's office, where other cans were cut, revealing the same conditions. Mr. Goebel at that time admitted that respondent's contention and complaints were well founded, and so notified appellant by letter under date of May 1, 1930.

In response to that letter, appellant wrote to Goebel-Pratt Co., calling attention to the fact that, in its telegram of August 15, 1929, it had confirmed the order on

a "cut-out count" basis. A can of the fruit was then sent to appellant, who made a test thereof and subsequently reported to Goebel-Pratt Co. that it showed that the prunes numbered 44.80 to the pound, cut-out count, conforming to the grade which it claimed that, under its original telegram, it had agreed to deliver. The letter, however, made no reference to respondent's complaint of the mushy condition of the fruit. Respondent, being unable to obtain any adjustment of its claim, and having already paid for the goods, began this action seeking recovery of damages for breach of contract.

According to the contentions of both parties, the problems involved in this appeal are these: (1) What was the real subject matter of the contract? (2) If the appellant did not furnish the kind or quality of the goods the contract called for, can the respondent recover damages where there has been a delay in the inspection of the merchandise and presentation of a claim amounting to six weeks? (3) If the respondent is entitled to recover, what is the proper measure of recovery?

Under the first problem, the question is whether the subject matter of the contract had reference to prunes of the 40-50 grade in their dried state, or prunes of the 40-50 cut-out count. Appellant contends that the contract is uncertain and ambiguous, on its face, in its description of the goods, and that, therefore, reference must be had to the correspondence antedating it, particularly to appellant's confirmatory telegram to Goebel-Pratt Co. But the contract on its face is neither uncertain nor ambiguous. It specifically calls for 40-50 prunes put up in 20° syrup. Mr. Goebel, the selling agent for appellant, admitted and insisted that such was the understanding between himself and the respondent. Any inconsistency or ambiguity in

the contract between the parties would be *created,* not *allayed,* by the consideration of appellant's telegram.

The contract was on the form supplied by the appellant, and was drafted by Goebel-Pratt Co., its exclusive sales agent. Even if its language were susceptible of two constructions, appellant, having supplied it, cannot insist upon that construction which is more favorable to it, but, as between it and the other party affected thereby, must accept the interpretation which is the less favorable to it. *Clise Investment Co. v. Stone,* 168 Wash. 617, 13 P. (2d) 9. Further, since by its letter of August 30, 1929, it suggested that precaution should be taken to see that certain changes appearing on its copy of the contract should also appear on respondent's copy, but made no suggestion as to any change in the description of the grade of fruit, it must be held to have accepted the contract as it appeared on its face with reference to the grade. We hold adversely to appellant's contention on the first problem presented.

Appellant next contends that respondent is foreclosed of any right to recover because of delay in making claim. It is apparent from our rather detailed statement of the case, and particularly from appellant's own correspondence, that, even if a ten-day inspection and claim had been made, strictly as contended for by appellant, it would have been futile. Appellant has at all times insisted that the goods ordered and sold were according to its interpretation of the contract. The purpose of a prompt inspection and claim is to enable the party adversely affected to check or test its accuracy at a time when an investigation would have been of some avail. But here the appellant neither needed nor desired any proof that the prunes were not of the 40-50 grade in their dried state. It admitted that fact, and insisted that it never con-

templated the delivery of prunes of that size. As to the complaint that the prunes were in a mushy condition, while it seems to us that it was not the major complaint but at most an incidental one, yet, even as to that, appellant does not seem to have disputed it in its correspondence, whether by oversight or because it was recognized as well-founded or else refused as ill-founded, we do not know. But meeting squarely the · question of the timeliness of the claim, we think that appellant's contention cannot be sustained.

It is true that clauses in contracts limiting the time for inspection and making claim for defects are valid and binding where the defect is patent. But the rule is otherwise where the defect is latent.

"The courts have very generally recognized the right of parties to a contract for future delivery of goods sold to stipulate as to the time and place of inspection and as regards open defects easily discovered, a provision in the contract for examination or inspection within a very short time and notice of defects in quality, etc., will be binding on the parties. Where, however, the defects are latent and such as are not readily discoverable by inspection, no unreasonable limitation as regards the time for inspection will protect the seller." 23 R. C. L. 1434.

The line of cleavage between the contentions of the parties herein splits upon the question of whether the defect was a patent or a latent one. The appellant contends that, if respondent had cut one or more of the cans of fruit, which it had bought and paid for, it could readily have discovered the defects. Possibly so. But we do not think that under the circumstances it was required to do this. The appellant was a responsible firm; respondent had done business with it for years, and had purchased thousands of dollars worth of goods from it. The merchandise was bought for purpose of re-sale in the original containers. The fruit was con-

tained in hermetically sealed cans of approximately a gallon content, appropriately labeled and packed in fibre cases. Cutting a can would have involved the destruction or loss of its contents.

Appellant's contention would lead one to ask how many cans it would be incumbent on respondent to open. If, in a particular case such as this, one can is opened and found to be in satisfactory condition, must the buyer run the risk of assuming that the rest are in the same condition, or must he open a substantial number of cans in order to thoroughly satisfy himself that he has not been imposed upon? On the other hand, if the first can that is opened shows a defective condition, the purchaser is faced with the alternative of assuming that the rest are likewise defective, or else that one can is, after all, only negligible, and that the rest are in good condition. To subject the purchaser to such a dilemma or uncertain contingency, would manifestly be unfair.

Even at common law, the rule of *caveat emptor* would not apply to the circumstances revealed in this case, for that rule merely requires that the buyer shall take care, not that he shall take a chance. Sec. 14 of the uniform sales act (Rem. 1927 Sup., § 5836-14) provides that, when there is a contract to sell, or a sale of goods by description, there is an implied warranty that the goods shall correspond with the description. This is but a statutory formula of what common sense and fair dealing dictate.

Authorities upon the question here involved are not very numerous, so far as our attention has been called to them. The most apposite one is that of *American Soda Fountain Co. v. Medford Grocery Co.,* 128 Ore. 83, 262 Pac. 939, wherein it was held that, upon a sale of crushed fruits, in hermetically sealed containers, by

a manufacturer to a wholesaler for re-sale, the purchaser is entitled to a reasonable time for inspection, and is not required to open the cans upon their delivery and thus incur the risk of having the goods spoil.

In *Los Angeles Olive Growers' Ass'n. v. Pacific Grocery Co.*, 119 Wash. 293, 205 Pac. 375, it was held that a ten-day provision for inspection applied only to patent, not latent, defects. The court therein quoted from 23 R. C. L. 1434, *supra*, to the effect that, where the defects are latent and such as are not readily ascertainable by inspection, no unreasonable limitation as regards the time for inspection will protect the seller. There are a number of cases, many of them cited by appellant, wherein it was variously held that specific clauses providing for inspection were reasonable. In those cases, however, inspection required nothing more than casually observing a package, prying open the top of a barrel, unrolling a wrapper, or testing the operation of a piece of machinery, instances where the inspection did not require the destruction of a part of the goods themselves.

In this case, we agree with the conclusions of the trial court that the defect was a latent one, and did not fall within the ten-day inspection clause; that that clause was referable only to those claims upon which quick and prompt action must be taken in order to protect one party or the other, such as damages in transit, rustiness, or irregularity in size, of cans, faulty labeling and such other matters as were readily ascertainable.

■ The third problem relates to the proper measure of recovery. Sec. 69 (7) of the uniform sales act, Rem. 1927 Sup., § 5836-69, subd. 7, provides:

"In the case of breach of warranty of quality, such loss, in the absence of special circumstances showing proximate damage of a greater amount, is the dif-

ference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty.''

Under the evidence in this case, the value that the goods would have had if they had answered to the warranty was $9 per dozen cans, or a total of $1,332; the bulk of the goods was disposed of at $4.25 per dozen cans, leaving a claimed loss of $4.75 per dozen cans, or a total of $703. Some of the goods, it is true, were sold at a higher figure, but on the other hand some of them were valueless and brought nothing. The evidence further showed that, after the delivery of the goods, the market price which the wholesaler could have obtained for them dropped progressively from ten to twenty per cent. Taking this fact into consideration, the lower court allowed a recovery of $553.25, which was a reduction of twenty-one per cent on a constant market price. We think that the court's ruling in this respect was correct and just.

The judgment is affirmed.

TOLMAN, C. J., MAIN, and BEALS, JJ., concur.