### KANSAS CITY WHOLESALE GROCERY CO. v. WEBER PACKING CORPORATION.

No. 5745.   Decided November 17, 1937.   (73 P. [2d] 1272.)

Rehearing Denied December 31, 1937.

*Joseph E. Evans,* of Ogden, for appellant.

*DeVine, Howell & Stine* and *A. W. Agee,* all of Ogden, for respondent.

FOLLAND, Chief Justice.

This is an action to recover money paid for certain catsup on grounds of breach of implied warranty. The defendant, Weber Packing Corporation, sold by contract of August 4, 1930, and in March, 1931, shipped, 303 cases of tomato catsup to plaintiff, Kansas City Wholesale Grocery Company. In September of 1931 the 271 cases of catsup remaining unsold in plaintiff's warehouse were examined by an inspector of the Federal Food & Drug Administration and after a microscopic examination of samples from 18 cans by competent chemists the catsup was found to contain a mold filament in 67 per cent of the microscopic fields examined. It is alleged that the federal regulations condemn, as unfit for food, catsup containing such mold in excess of 66 per cent of the microscopic fields examined.

A libel against the catsup was prosecuted by the government in the United States District Court at Kansas City and the entire 271 cases of catsup condemned and by the United States marshal destroyed. The present action was brought by the grocery company to recover from the packing corporation the amount paid by it for the destroyed catsup, together with interest. From a judgment on a directed verdict for defendant, plaintiff appeals.

A number of interesting questions are raised. Defendant urges five obstacles in the way of recovery by plaintiff: (1) That plaintiff is not entitled to maintain the action in the state court because it is a Missouri corporation which has never qualified by compliance with the laws of Utah to do business within this state. (2) The contract upon which the action is founded is void as to plaintiff because its making constituted doing business within the state by a nonconforming foreign corporation. (3) That the transaction between the packing corporation and the grocery company did not constitute a shipment in interstate commerce and therefore did not fall within the operation of the Federal Food and Drug Act (as amended, 21 U. S. C. A. § 1 et seq.).

(4) The contract expressly provides that all claims except for "swells" must be presented within ten days from the receipt of the goods; that the goods were delivered by the packing corporation to the grocery company at North Ogden, Utah, March 1, 1931, and that no claim was presented for the alleged loss until September 30, 1931, or more than ten days after the receipt of the goods. (5) The condemnation of the catsup by the government is not binding on defendant because it received no notice of the libel, and, further, that there is no proof of any standard of purity of tomato catsup established by the regulations of the Department of Agriculture and therefore no proof of any violation of any such regulation.

It would seem the contract of purchase was made and performed in Utah. The order for the goods was solicited from the grocery company on behalf of the packing corporation by a broker in Kansas City, Mo. The written contract of sale was signed by the grocery company at Kansas City and sent to Ogden, where it became a binding obligation on the part of both parties upon acceptance and execution by the packing corporation. A contract between parties in different states is made at the place where the last act necessary to give it validity is performed. *Lawson* v. *Tripp,* 34 Utah 28, 95 P. 520. The written contract provided: "Terms: F. O. B. sellers factory, sight draft with bill of lading." The buyer was to carry its own insurance and "Notwithstanding shipped to seller's order, goods are at risk of buyer from and after delivery to carrier." The contract was dated August 4, 1930. The goods were delivered by the packing corporation to the railroad carrier for shipment March 24, 1931, and went forward in a pool car shipped by and in the name of North Ogden Canning Company. The catsup was not a sufficiently large consignment to fill a car so arrangements were made by the shipper, the packing corporation, for the goods to go forward in a car containing other goods shipped by the North Ogden Canning Company and consigned by it to a consignee in Kansas City. The

catsup was received, paid for, and lodged in plaintiff's warehouse at Kansas City.

We have, therefore, a Utah contract, fulfilled by the packing corporation by delivery of the goods to a carrier for transportation to Kansas City in interstate commerce.

The grocery company is a Missouri corporation and has never complied with the provisions of section 18-8-1, R. S. Utah 1933, so as to entitle it to do business in the state of Utah and enjoy the benefit of the laws of this state relating to corporations pursuant to section 18-8-5, R. S. 1933, as amended by chapter 12, Laws of Utah 1933, which provides that a noncomplying corporation doing business in Utah shall not have the right to sue, prosecute, or maintain any action in the courts of this state, and that any contract made in pursuance of such business by such corporation shall be void. It is undisputed that the grocery company never at any time had any office, warehouse, or place of business in Utah, nor did it own or manage any property or business in the state. It had neither salesmen nor buyers nor representatives of any kind in the state nor had it sold any of its merchandise here or bought any goods or merchandise within the state except only the transaction in question in this case and possibly one other purchase of catsup from the same packing corporation.

Under these facts it is clear plaintiff was not doing business in Utah within contemplation of the cited statute. Certainly the cases of *First National Bank of Price* v. *Parker,* 57 Utah 290, 194 P. 661, 12 A. L. R. 1373; and *Dunn* v. *Utah Serum Co.,* 65 Utah 527, 238 P. 245, cited and relied on by defendant, do not sustain its position. In the Parker Case it was conceded the corporation had been and was doing business within the state. That question was not in issue. In the Dunn Case, the corporation had at the time of suit complied with the law, but the contracts in suit were entered into by it prior to the time of its qualification. The court held they were made at a time when the company was doing business in the state without having complied

with the enabling statute. The evidence showed the corporation had been doing business other than merely the making of the note and mortgage in question. No case has been cited, and we have found none, holding that the purchase of goods by a foreign corporation under facts similar to those here is such "doing business" as will bring the corporation within the terms of the statute. The mere purchase, even under a Utah contract, of goods in Utah to be shipped to Missouri, is a transaction in interstate commerce which the Utah law regulating foreign corporations does not touch. *McNaughton Co.* v. *McGirl,* 20 Mont. 124, 49 P. 651, 38 L. R. A. 367, 63 Am. St. Rep. 610; *Lemke* v. *Farmers' Grain Co.,* 258 U. S. 50, 42 S. Ct. 244, 66 L. Ed. 458; *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282, 42 S. Ct. 106, 66 L. Ed. 239. *Miller Brewing Co.* v. *Capitol Distributing Co.* (Utah) 72 P. (2d) 1056.

We need not decide, and therefore do not, whether the catsup was the property of the buyer or the seller at the beginning of or during the transportation. Irrespective of ownership at that time, the packing corporation knew the catsup was intended for shipment in interstate commerce and it actually placed the goods in the channels of such commerce. The transaction was therefore within the operation of the Federal Food and Drug Act. *Glaser, Kohn & Co.* v. *United States* (C. C. A.) 224 F. 84, 85.

Defendant next objects that plaintiff is prohibited from recovering because the contract provides, "All claims other than swells must be made within ten days from receipt of goods," and no claim for the presence of mold was made within ten days from the date of receipt of the goods. Plaintiff, however, contends that there is an implied warranty on the part of the seller that the food product would be fit for the purpose for which it was sold and that the express provision of the contract does not apply to latent defects, such as the presence of mold, which could not be discovered by ordinary inspection, such as taste, smell, and sight. There

is no dispute but that the presence of mold could only be discovered by a careful microscopic examination.

Where the seller is also the manufacturer there is an implied warranty that the goods sold as well as the sample, are free from latent defects not discoverable on ordinary examination. *Nixa Canning Co.* v. *Lehmann-Higginson Grocer Co.*, 70 Kan. 664, 79 P. 141, 70 L. R. A. 653. When the goods are sold for shipment in interstate commerce, the implied warranty that the goods are fit for the purpose for which they were manufactured and sold should meet the test of the federal pure food act.

With respect to the timeliness of the claim, it is true, clauses in contracts limiting the time for inspection and making claim for defects are valid and binding where the defects are patent, but not where they are latent. *National Grocery Co.* v. *Pratt-Low Preserving Co.*, 170 Wash. 575, 17 P. (2d) 51, 54, In this latter case the facts are somewhat similar to those in the instant case. The contract of sale contained the identical provision quoted above. The controversy had reference to the number and quality of prunes in cans. The court held the defect a latent one and the contract provision had no application thereto. The language used is particularly applicable here:

"But meeting squarely the question of the timeliness of the claim, we think that appellant's contention cannot be sustained. It is true that clauses in contracts limiting the time for inspection and making claim for defects are valid and binding where the defect is patent. But the rule is otherwise where the defect is latent.

" 'The courts have very generally recognized the right of parties to a contract for future delivery of goods sold to stipulate as to the time and place of inspection, and as regards open defects easily discovered, a provision in the contract for examination or inspection within a very short time and notice of defects in quality, etc., will be binding on the parties. Where, however, the defects are latent and such as are not readily discoverable by inspection, no unreasonable limitation as regards the time for inspection will protect the seller.' 23 R. C. L. 1434, § 257.

"The line of cleavage between the contentions of the parties herein splits upon the question of whether the defect was a patent or a latent

one. The appellant contends that if respondent had cut one or more of the cans of fruit, which it had bought and paid for, it could readily have discovered the defects. Possibly so. But we do not think that under the circumstances it was required to do this. The appellant was a responsible firm; respondent had done business with it for years and had purchased thousands of dollars worth of goods from it. The merchandise was bought for purpose of resale in the original containers. The fruit was contained in hermetically sealed cans of approximately a gallon content, appropriately labeled, and packed in fibre cases. Cutting a can would have involved the destruction or loss of its contents. Appellant's contention would lead one to ask how many cans it would be incumbent on respondent to open. If, in a particular case such as this, one can is opened and found to be in satisfactory condition, must the buyer run the risk of assuming that the rest are in the same condition, or must he open a substantial number of cans in order to thoroughly satisfy himself that he has not been imposed upon? On the other hand, if the first can that is opened shows a defective condition, the purchaser is faced with the alternative of assuming that the rest are likewise defective or else that one can is after all only negligible and that the rest are in good condition. To subject the purchaser to such a dilemma or uncertain contingency would manifestly be unfair."

*American Soda Fountain Co.* v. *Medford Grocery Co.*, 128 Or. 83, 262 P. 939; *Los Angeles Olive Growers' Ass'n* v. *Pacific Grocery Co.*, 119 Wash. 293, 205 P. 375; *W. F. Main Co.* v. *Field*, 144 N. C. 307, 56 S. E. 943, 11 L. R. A. (N. S.) 245.

Respondent cites *Consolidated Wagon & Mach. Co.* v. *Barben*, 46 Utah 377, 150 P. 949; *Advance-Rumely Thresher Co.* v. *Stohl*, 75 Utah 124, 283 P. 731; *Wasatch Orchard Co.* v. *Morgan Canning Co.*, 32 Utah 229, 89 P. 1009, 12 L. R. A. (N. S.) 540; *Walter Pratt & Co.* v. *W. C. Morris & Co.*, 87 S. W. 783, 27 Ky. Law Rep. 1035; *Beasley* v. *Huyett & Smith Mfg. Co.*, 92 Ga. 273, 18 S. E. 420; and *Young* v. *Wallace*, 201 Ky. 30, 255 S. W. 856. In none of these cases were the facts similar to this before us, nor were the contract provisions of warranty the same. The principles of law therein announced are not strictly applicable here.

The last question raised has to do with the condemnation of the catsup by the United States government. Most of the

evidence offered respecting the libel in the federal court, the government's activities with respect to the catsup, and the government regulations respecting mold in catsup, ▮ were excluded by the trial court. Such rulings are assigned as error. The case has been argued as if all this evidence were before the court on this appeal. We shall treat this case the same way.

Three points are urged: (1) That no notice was given defendant of the pendency of the libel in the federal court. (2) There is no proof of the alleged regulations under the Federal Food and Drug Act. (3) The judgment of condemnation of catsup by the federal Court is not ▮ binding on defendant. We shall discuss these questions in reverse order. The Federal Food and Drug Act, § 10, title 21, § 14, U. S. C. A., provides that, "The proceedings of such libel cases shall conform, as near as may be, to the proceedings in admiralty." The rule respecting the binding effect of a decree in admiralty is stated by Mr. Justice Story, speaking for the Supreme Court of the United States, in *Gelston* v. *Hoyt,* 3 Wheat. 246, 318, 4 L. Ed. 381:

"Where property is seized and libelled as forfeited to the government, the sole object of the suit is to ascertain whether the seizure be rightful, and the forfeiture incurred or not. The decree of the court, in such case, acts upon the thing itself, and binds the interests of all the world, whether any party actually appears or not. * * * The reason, however, of this rule is to be found in the nature of proceedings in rem. To such proceedings all persons having an interest or title in the subject matter are, as we have already stated, in law, deemed parties; and the decree of the court is conclusive upon all interests and titles in controversy before it."

The decree is held binding on all parties in interest only if proper notice is given pursuant to Admiralty Rule 9 (now superseded by Rule 10, title 28 U. S. C. A. following section 723), which requires "process in rem to be served, not only by arresting the property, but by giving notice by publication of the arrest, and of the time assigned for the return of the process and the hearing of the cause." *Bailey* v. *Sundberg*

(C. C. A.) 49 F. 583, 585. Such notice was given by publication in this case and also by posting as required by the court. This is made to appear by certified copies of the proceedings in the federal court. The decree in that case was therefore binding on all parties having any interest in the subject matter, the catsup, with respect to the matter litigated in the libel, that is, whether the seizure be rightful and the forfeiture incurred or not.

There was no proof or offer of proof of any regulation shown to have been adopted by any board or officer, but under the circumstances none was necessary. *United States* v. 200 *Cases of Adulterated Catsup* (D. C.) 211 F. 780. The federal law prohibits shipment in interstate commerce of any article or food which is adulterated within the meaning of the act. Food and Drug Act, § 2, Title 21, § 2, U. S. C. A. A food article is deemed adulterated if it consists in whole or in part of a filthy, decomposed animal or vegetable substance. Title 21, § 8, U. S. C. A.

There were offered but rejected printed regulations of the Department of Agriculture and a letter from the chief of that department both indicating that the Department of Agriculture would not advise proceedings against the catsup unless the mold filaments were present in the microscopic count in more than 66 per cent of the microscopic fields examined. The testimony of Dr. Joseph G. Hawthorne, manager of the Kansas City Testing Laboratory, was that the presence of mold filaments in 67 per cent of the microscopic fields indicated the catsup contained filthy and decomposed tomatoes and that the catsup was impure; that the presence of the mold established the fact that the tomatoes were decomposed at the time the catsup was prepared, and that if the catsup was properly processed or canned, mold or impurities would not develop or proceed further; that in the processing, vinegar, spices, and other flavoring material are used and the mold filament present is not apparent to the eye alone; that the fact that decomposed tomatoes had been

used in the preparation of the catsup could only be determined by a microscopic examination; that careful processing can hold down the percentage of mold filament showing mold to less than 25 per cent. He further testified that it would not be possible for a buyer of catsup to determine the decomposition and mold present by opening the cans and seeing, tasting, and smelling the contents and that it was not the custom of wholesalers, jobbers, and buyers of canned goods to submit them to a bacteriological or chemical laboratory analysis; that the duty of meeting such requirements rested on the manufacturer or canner.

We believe the evidence offered and received, together with that offered and rejected (which should have been admitted), on this phase of the case, was sufficient to go to the jury on the question of whether or not the catsup when shipped by defendant failed to comply with the requirements of the federal law.

With respect to notice, we have already indicated that publication of notice is sufficient to comply with the requirements of the law and to bind any person interested in the catsup in question. The evidence of telegrams and letters, many of which were rejected by the trial court, sufficiently indicated that the defendant had notice of the fact that the government had taken steps to confiscate and condemn the catsup. After exchange of preliminary telegrams, plaintiff wired the defendant as follows: "Congress Catsup condemned account decomposition which as explained to us was because of mold count and spores stop Attachment from United States Court has been served on us and expect goods will be ordered destroyed. See nothing we can do but willing to receive suggestions from you."

Other telegrams and letters indicate that defendant was sufficiently advised in the premises and that, had it seen fit so to do, it could have appeared in the federal court to protect itself in one of several ways open to it. It chose not to do so and to rely on the express warranty in the contract,

claimed by it to exclude any implied warranty, and this seems to be the position taken by the trial court. The case should have been submitted to the jury with appropriate instructions.

The judgment is reversed, and the cause remanded to the district court of Weber county for a new trial. Costs to appellant.

HANSON, WOLFE, and LARSON, JJ., concur.

MOFFAT, J., I dissent.