[No. 54612-6. En Banc. September 20, 1990.]

AMERICAN NURSERY PRODUCTS, INC., *Appellant,* v.
INDIAN WELLS ORCHARDS, ET AL, *Respondents.*

218

*Lane Powell Moss & Miller,* by *Michael D. Dwyer* and *Douglas E. Wheeler,* for appellant.

*Velikanje, Moore & Shore,* by *John S. Moore* and *Corinna D. Ripfel–Harn,* for respondents.

DOLLIVER, J.—In the fall of 1983 defendant Indian Wells Orchards decided to acquire apple trees for development of a 500–acre orchard. After contacting various commercial nurseries to grow the trees, Indian Wells entered negotiations with plaintiff American Nursery Products, Inc., doing business as Mount Arbor Nurseries (Mt. Arbor). Pursuant to preliminary discussions between the parties, Mt. Arbor drafted a proposed contract for approval by Indian Wells. After discussing the proposed contract, a revised contract was delivered to the general manager of Indian Wells during December 1983. On January 18, 1984, after reading the revised contract and reviewing it with other Indian Wells representatives, the general manager executed the contract on behalf of Indian Wells.

The entire contract consists of six pages, the last of which is exclusively devoted to signatures and arrangements on financing. It is written in normal size type and double spaced between paragraphs. The terms of the agreement include the duties of the parties, the allocation

of risk, guidelines for acceptance and rejection of deliveries, and the available remedies. Under the terms of the agreement, Mt. Arbor was to grow 200,000 grafted apple trees and 500,000 budded apple trees for Indian Wells. Indian Wells was to provide the 700,000 trees for growing and Mt. Arbor was to provide up to 65,000 understocks for grafting and budding as necessary to compensate for mortality during the nursery phase. Trees produced by grafting were to be delivered in the fall of 1984 or spring of 1985, and trees produced by budding were to be delivered in the fall of 1985 or spring of 1986. By agreement of the parties, the deliveries took place in the spring of 1985 and 1986.

The parties agreed they were entering into a service agreement and no warranties, express or implied, were given which extended beyond the conditions and services in the contract. Mt. Arbor did warrant, however, that at least 88 percent of the delivered trees would have a caliper size greater than five–sixteenths of an inch. Any trees not meeting this standard could be rejected by Indian Wells.

The contract provided for a 15–day period within which Indian Wells could inspect and count the delivered trees and give notice of rejection of the delivery or adjustment to the bill of lading. In the event of rejection by Indian Wells, paragraph 5.2 provided for a limited remedy whereby "Grower [Mt. Arbor], at its option, shall replace the non–conforming Trees or reduce the purchase price."

Once the trees were accepted, the contract placed the risk of loss upon Indian Wells. Paragraph 3.4 provided:

> All Trees shall be maintained by Grower in a moist condition between the time of harvest and the time of delivery to Owner [Indian Wells], after which delivery Owner accepts all maintenance responsibility for, and risk of loss to, the Trees.

The contract in section 9 entitled *"Default; Remedies"* further provided in paragraph 9.3:

> The party declaring default shall have all rights provided under the Washington Uniform Commercial Code and other applicable laws of the State of Washington and the terms and provisions of this Agreement; provided that in no event shall Grower be subject to or liable for incidental or consequential

damages. All rights and remedies of either party may be exercised consecutively, successively and cumulatively. The prevailing party shall be entitled to reimbursement for any expenses incurred by it in enforcing and protecting its rights under this Agreement, including but not limited to reasonable attorney fees and expenses.

Pursuant to the contract, the rootstocks and the budding and grafting wood were delivered by Indian Wells to Mt. Arbor. Prior to planting the grafted and the to–be–budded rootstocks in 1984, Mt. Arbor dipped the rootstocks in various fungicides and bactericides, including Ridomil 2E. Ridomil 2E is considered by its manufacturer to be an extremely erratic chemical which can, and does, cause damage to rootstocks at lesser concentrations than those used by Mt. Arbor. After the dipping in Ridomil, many of the grafted rootstocks broke and died and many of the to–be–budded rootstocks died prior to budding or failed to grow in a normal manner. Consequently, Mt. Arbor delivered only 108,158 of the 200,000 grafted trees and 372,360 of the 500,000 budded trees anticipated under the contract. Of those trees delivered, approximately 32,750 were rightfully rejected by Indian Wells. Of those accepted and planted, 89,983 later died. Indian Wells was able to cover 190,790 of the 342,215 trees short under the contract. Of the trees covered, 73,164 are 1 year behind in production.

In April 1986, Mt. Arbor brought suit against Indian Wells in the Superior Court for Yakima County to recover the sums due under the contract. Indian Wells counterclaimed alleging breach of contract and negligence.

The trial court, sitting without a jury, found the dipping of the rootstocks in Ridomil proximately caused over $2.3 million in direct and consequential damages and constituted negligence per se and a breach of contract. Over $1.7 million of these damages resulted from production losses. The damages, plus attorney fees and costs of $147,198.01, were reduced by the $383,528.44 still due under the contract, and a judgment of $2,081,854.10 was awarded to Indian Wells. In awarding these damages, the trial court

held the provision in the agreement which excluded incidental and consequential damages was unconscionable, unenforceable and against public policy. We granted Mt. Arbor's appeal. We affirm in part and reverse in part.

 The first issue is whether the contractual limitation on incidental and consequential damages is unconscionable under RCW 62A.2–719(3). We have held RCW Title 62A applicable to bailments arising from a service transaction. *Mieske v. Bartell Drug Co.*, 92 Wn.2d 40, 593 P.2d 1308, 6 A.L.R.4th 923 (1979). RCW 62A.2–719(3) provides:

> Limitation of . . . consequential damages is valid unless it is established that the limitation is unconscionable.

Whether an exclusionary clause is unconscionable is determined as a question of law. *Schroeder v. Fageol Motors, Inc.*, 86 Wn.2d 256, 262, 544 P.2d 20 (1975). Exclusionary clauses in purely commercial transactions, such as the one at hand, are prima facie conscionable and the burden of establishing unconscionability is on the party attacking it. *See Schroeder*, at 262–63. Appellate review of a conclusion of law, based upon findings of fact, is limited to determining whether a trial court's findings are supported by substantial evidence, and if so, whether those findings support the conclusion of law. *Willener v. Sweeting*, 107 Wn.2d 388, 393, 730 P.2d 45 (1986). Substantial evidence is evidence sufficient to persuade a fair–minded person of the truth of the declared premise. *Holland v. Boeing Co.*, 90 Wn.2d 384, 390–91, 583 P.2d 621 (1978). In reviewing the record, we find there is substantial evidence to support the trial court's findings of fact. However, we do not agree these findings support the legal conclusion of unconscionability.

 Unconscionability is determined in light of all the surrounding circumstances, including (1) the manner in which the parties entered into the contract, (2) whether the parties had a reasonable opportunity to understand the terms of the contract, and (3) whether the important terms were hidden in a maze of fine print. *Schroeder*, at 260. None of these factors is conclusive; rather, unconscionability is determined under the totality of the circumstances.

*Schroeder,* at 260. The party defending the clause may prove the clause is conscionable regardless of the surrounding circumstances if the general commercial setting indicates a prior course of dealing or reasonable usage of trade as to the exclusionary clause. *See Mieske v. Bartell Drug Co., supra* at 49; *Schroeder,* at 260–61; *Hartwig Farms, Inc. v. Pacific Gamble Robinson Co.,* 28 Wn. App. 539, 546–47, 625 P.2d 171 (1981). The trial court found no prior dealings between the parties and no trade usage. Therefore, whether the exclusionary clause is conscionable is controlled by an analysis of the three *Schroeder* factors.

In consumer sales transactions, the manner in which parties enter into contracts is strictly regulated. In order to uphold an exclusionary clause in the consumer sales context, the clause must be "explicitly negotiated between buyer and seller", and the remedies being excluded must be "set forth with particularity". *See Berg v. Stromme,* 79 Wn.2d 184, 196, 484 P.2d 380 (1971); *Miller v. Badgley,* 51 Wn. App. 285, 293, 753 P.2d 530 (1988); *Thomas v. Ruddell Lease–Sales, Inc.,* 43 Wn. App. 208, 213, 716 P.2d 911 (1986). While *Berg* involved a disclaimer in a consumer sales transaction, the *Berg* rule has been extended to cases involving exclusionary clauses under RCW 62A.2–719(3). *Baker v. Seattle,* 79 Wn.2d 198, 484 P.2d 405 (1971).

In *Schroeder,* we stated the *Berg* rule also applied to commercial transactions in which both litigants were business persons. *Schroeder,* at 261 (citing *Dobias v. Western Farmers Ass'n,* 6 Wn. App. 194, 491 P.2d 1346 (1971)). However, a close reading of *Schroeder* indicates that, rather than extending the *Berg* rule to all commercial transactions, the concern was to prevent the utilization of "'unfair surprise' to the detriment of one of the parties." *Schroeder,* at 262.

In *Schroeder,* the buyer purchased a used truck from Fageol Motors. The truck warranties and disclaimers were not set forth in the purchase order signed by the buyer; instead, these clauses were buried in an owner's manual.

*Schroeder,* at 257. The seller did not go through the owner's manual or advise the buyer of the existence of any disclaimers or exclusionary clauses; it simply directed the buyer to place the book in the glove box. *Schroeder,* at 257. Similarly, the disclaimer in *Dobias* was not a part of the commercial contract signed by the parties but was printed on the label of the product. *Dobias,* at 200. In addition, the manufacturer represented that the product was suitable for the proposed purpose. *Dobias,* at 199.

While *Schroeder* held there was no reason to prohibit the application of the *Berg* rule to transactions between business persons, *Schroeder* did not hold that *Berg* should be applied to every commercial transaction. To so hold would unnecessarily interfere with the freedom to contract in the commercial context. In consumer sales transactions, intervention is warranted to counteract the inherent inequality of bargaining power and the resultant inequities. Parties to a commercial contract, however, generally have equal bargaining power and an equal ability to seek advice and alternative offers. As a result, commercial contracts are less subject to the type of unfair surprise which may be found in consumer sales transactions. This being so, only those commercial transactions with sufficient indicia of unfair surprise in the negotiations should be subject to the *Berg* rule.

Consistent with this position, we have refused to apply the *Berg* requirements to negotiations between competent persons dealing at arm's length, with no claim of an adhesion contract, when the contract contains a specific disclaimer and when the contract language is clear. *See Frickel v. Sunnyside Enters., Inc.,* 106 Wn.2d 714, 721, 725 P.2d 422 (1986); *see also Travis v. Washington Horse Breeders Ass'n, Inc.,* 111 Wn.2d 396, 402, 759 P.2d 418 (1988).

The stricter *Berg* rule is not warranted here. The contract was negotiated by the parties. The text of the entire contract was only six pages in length. The exclusionary clause was located in a section clearly labeled *"Default;*

*Remedies*", and the contract language was clear in excluding incidental and consequential damages. As in *Frickel,* there are no indicia of unfair surprise in the negotiations between the parties to warrant application of the *Berg* rule.

The second *Schroeder* factor is also met because the parties had a reasonable opportunity to understand the terms of the contract. Although the trial court believed the general manager of Indian Wells did not have the ability to know or understand fully the meaning of the exclusionary clause, the manager did have a reasonable opportunity to understand the provision. The manager had the contract from sometime in December 1983 until January 18, 1984, certainly sufficient time to read the contract and seek advice as to any portions which were not understood. The extent to which parties read the contract and seek outside advice is a matter of choice. *See Frickel,* at 721. All the law requires is that the parties are given the opportunity to understand the terms of a negotiated contract. There is no question but that the general manager had such an opportunity.

Lastly, the exclusionary clause was not "hidden in a maze of fine print". *Schroeder,* at 260. The contract was only six pages long, including the signature page, and the clause in question was located in a section clearly labeled "*Default; Remedies*", which was less than half a page in its entirety. The clause was not buried in fine print, it occupied 2 out of a total of only 11 lines in the provision, and was in the same size type as the remainder of the contract.

The perhaps misguided judgment on the part of Indian Wells does not prevent the exclusionary clause from being conscionable. Both parties, in an arm's–length transaction, negotiated and entered into a contract with no indicia of unfair surprise; the general manager of Indian Wells had a reasonable opportunity to understand the terms of the contract; and the challenged clause was not hidden in a maze of fine print. Under the totality of the circumstances surrounding the inception of this contract, Indian Wells has not satisfied its burden of proving the exclusionary clause is

unconscionable. As pointedly stated by Judge Learned Hand, "[I]n commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves." *See Baird Co. v. Gimbel Bros., Inc.*, 64 F.2d 344, 346 (2d Cir. 1933).

Since we find the exclusionary clause is conscionable, the question then becomes whether the clause is enforceable. Indian Wells asserts the limitation on consequential damages is invalid because the limited remedies provided for in the contract failed of their essential purposes.

The remedies in the contract, found in paragraphs 2.1, 5.2, and 9.3, provided for normal mortality of understocks, rejected trees, and trees that were never delivered. Paragraph 2.1 provided:

> Grower agrees to provide at no cost to Owner up to forty thousand (40,000) certified EMLA 26 understocks for grafting and up to twenty five thousand (25,000) certified EMLA 26 understocks for budding as may be necessary to compensate for any mortality while growing during the nursery phase.

Paragraph 5.2 stated:

> In the event of the Owner's rejection or adjustment and Grower's acceptance of such rejection or adjustment, Grower, at its option, shall replace the non–conforming Trees or reduce the purchase price.

Lastly, paragraph 9.3 provided:

> The party declaring default shall have all rights provided under the Washington Uniform Commercial Code and other applicable laws of the State of Washington and the terms and provisions of this Agreement; provided that in no event shall Grower be subject to or liable for incidental or consequential damages. All rights and remedies of either party may be exercised consecutively, successively and cumulatively.

■ Because these limited remedies were not expressly agreed to in the contract to be exclusive remedies, resort to these remedies is optional under Washington's Uniform Commercial Code. *See* RCW 62A.2–719(1)(b); *see also* J. White & R. Summers, *Uniform Commercial Code* § 12–9, at 462–63 (2d ed. 1980). The Washington Comments state subsection (1)(b) is not intended to alter the rule expressed in *Northwest Perfection Tire Co. v. Perfection Tire Corp.*,

125 Wash. 84, 215 P. 360 (1923). *See* Official Comment 1, RCWA 62A.2–719.

In *Northwest Perfection Tire,* Northwest agreed to furnish tires to Perfection Tire for sale and distribution. A large quantity of the tires were defective. The contract provided the following permissive remedy in case of defective tires: "The Company [Northwest] also guarantees all tires, tubes and casings to be in good condition and to make good all defects therein due to defective manufacture." *Northwest,* at 92. Relying upon this provision, Northwest argued that Perfection Tire could not seek damages because it was limited to the remedy of replacement. *Northwest,* at 91. The court rejected this argument.

> We are unable to see in this language any plainly expressed intent to compel the Mt. Vernon company [Perfection] to resort exclusively to the remedy of replacement; but see therein only the intent to give it permission so to do. This seems to be a somewhat common provision in tire distributing contracts; made in view of the fact that even the best makes of tires will on rare occasions, have defective tires among shipments thereof of any considerable numbers; and when such occasionally defective tires appear, the dealer would quite probably prefer having replaced by perfect tires to his customers . . . But that does not mean that he is obliged to resort to that remedy unless *the contract by unmistakable terms so provides.*

(Italics ours.) *Northwest,* at 92.

The remedies provided for in this contract are similar to the remedy provided for in *Northwest* in that there is no expression of an intent of exclusivity. The limited remedies are permissive in nature; they are optional. Therefore, Indian Wells is not limited to the remedies provided in paragraphs 2.1, 5.2 and 9.3. Rather, Indian Wells has the option to seek other available remedies not validly excluded by the contract. The remedies available under the contract include the cost of cover for trees purchased as provided for in RCW 62A.2–711 and RCW 62A.2–712 and the recovery of market price damages for nondelivery of trees as provided in RCW 62A.2–711 and RCW 62A.2–713. Specifically, Indian Wells may recover its cover costs, the estimated value of trees short which could not be covered, and the

price of the Belgian rootstocks purchased by Mt. Arbor but not paid for less the contract cost avoided for trees that were not delivered. As to the trees which died after acceptance, the contract shifts the risk of this loss to the owner.

■ Once the limited remedies are determined to be nonexclusive and the available remedies identified, the inquiry is whether those remedies fail of their essential purposes. RCW 62A.2–719(2) provides as follows:

> Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Title.

There is disagreement over whether the failure of a limited remedy vitiates the validity of a conscionable exclusionary clause. *Compare Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co.,* 709 F.2d 427 (6th Cir. 1983) (consequential damage limitation enforced even where a limited remedy fails of its essential purpose) *with, e.g., Fiorito Bros., Inc. v. Fruehauf Corp.,* 747 F.2d 1309 (9th Cir. 1984) (failure of exclusive remedy clause rendered consequential damage clause unenforceable). This court has not yet addressed this issue. To determine whether it need be reached in this case, we must first decide whether the nonexclusive limited remedies fail of their essential purposes and whether the available remedies provide a fair quantum of remedy for Indian Wells. *See* Official Comment 1, RCWA 62A.2–719.

The Court of Appeals has held that an exclusive limited remedy fails of its essential purpose when there are unreasonable delays in providing the remedy or the party required to provide the remedy is unable to do so. *See Lidstrand v. Silvercrest Indus.,* 28 Wn. App. 359, 365, 623 P.2d 710 (1981). An exclusive remedy has also been held to fail of its essential purpose when the party required to provide the remedy, by action or inaction, causes the remedy to fail or when defects in goods are not discoverable upon reasonable inspection. *Marr Enters., Inc. v. Lewis Refrigeration Co.,* 556 F.2d 951, 955 (9th Cir. 1977) (and cases cited therein). *See also Milgard Tempering, Inc. v. Selas Corp.*

*of Am.*, 761 F.2d 553, 556 (9th Cir. 1985); *Fiorito Bros., Inc. v. Fruehauf Corp., supra.* When there are alternate exclusive limited remedies, such as repair or refund, the exclusive remedies have been held not to fail of their essential purposes, although there was a failure to repair or replace the defective parts. *Marr,* at 955.

The limited remedies in this case, however, are nonexclusive. When a limited remedy is nonexclusive, it is harder to say the limited remedy failed of its essential purpose because resort to other remedies is available under the contract. *Cf.* J. White & R. Summers § 12–10 (cases arising under § 2–719(2) question whether *exclusive* remedy fails of essential purpose). The essential purpose of a nonexclusive limited remedy is to provide the full measure of damages afforded under the Uniform Commercial Code or, as an option, the limited remedy provided under the contract, exclusive of any valid limitation otherwise agreed to in the contract. The contract, itself, in section 9.3 provides that "[a]ll . . . remedies of either party may be exercised consecutively, successively and cumulatively." In this case, Indian Wells may (1) resort to the optional limited remedies of replacement of rejected nonconforming trees or a reduction in the purchase price coupled with the provision for 65,000 understocks to compensate for the mortality during the nursery phase, or (2) resort to the available remedies of cover or market price damages under RCW 62A.2–711(1)(a) or RCW 62A.2–711(1)(b) for those trees and the trees which were not delivered. The contract does provide "a fair quantum of remedy" to Indian Wells; the nonexclusive limited remedies, under the circumstances of this case, do not fail of their essential purposes. *See* Official Comment 1, RCWA 62A.2–719.

Because the available remedies do not fail of their essential purposes, the exclusionary clause in this case is enforceable. We need not reach the question as to whether the failure of an exclusive or nonexclusive limited remedy renders unenforceable a conscionable limitation of consequential damages.

■ We next consider whether Indian Wells may recover incidental and consequential damages under a negligence theory. Generally, a breach of contract does not give rise to an action in tort. *See* 57A Am. Jur. 2d *Negligence* § 119 (1989). However, the negligent performance of a contract may create a tort claim if a duty exists independently of the performance of the contract. *See* 57A Am. Jur. 2d *Negligence* § 119, at 176. The trial court found Mt. Arbor negligent and negligent per se. Assuming, without deciding, the trial court properly based these findings on a tort duty arising independently from the contract, Indian Wells is still not entitled to recover incidental and consequential damages. The exclusionary clause is not void as against public policy and validly excludes the remedy of incidental and consequential damages regardless of whether the breach sounds in contract or tort.

The trial court held the exclusionary clause invalid on public policy grounds because bailees for mutual benefit are not permitted to disclaim or limit liability for negligence. The trial court, however, does not make any distinction between professional bailees and bailees for mutual benefit.

The general rule is that a party to a contract can limit liability for damages resulting from negligence. *See Wagenblast v. Odessa Sch. Dist. 105–157–166J,* 110 Wn.2d 845, 848, 758 P.2d 968 (1988). However, historically there are specific exceptions where limitations on liability are void as against public policy. *See Wagenblast,* at 849–51. One such exception prohibits professional bailees from limiting their liability for negligence. *Wagenblast,* at 849.

■ It is well settled in Washington that professional bailees may not limit their liability for negligence. *See Wagenblast,* at 849. However, the scope of this exception needs delineation. The distinction between bailees for mutual benefit and professional bailments has been blurred by two Court of Appeals cases. *See S.S. Kresge Co. v. Port of Longview,* 18 Wn. App. 805, 809, 573 P.2d 1336 (1977); *King Logging Co. v. Scalzo,* 16 Wn. App. 918, 922, 561 P.2d 206 (1977). These cases held that bailees for mutual benefit

may not disclaim liability for negligence. However, the precedent cited for this proposition neither supports that rule nor is it the rule in this state. In *Althoff v. System Garages, Inc.*, 59 Wn.2d 860, 864, 371 P.2d 48 (1962), we stated that Washington had adopted the general rule in 43 A.L.R.2d 419 (1955) that professional bailees cannot disclaim liability for their own negligence. The cited annotation defines professional bailees as

> persons who make it their principal business to act as bailees and who deal with the public on a uniform rather than on an individual basis, including primarily owners of parcel checkrooms, owners of parking places, garagemen, and warehousemen.

Annot., *Liability of Garageman for Theft or Unauthorized Use of Motor Vehicle*, 43 A.L.R.2d 403, 419 n.2 (1955); Annot., *Validity of Contractual Provision by One Other Than Carrier or Employer for Exemption From Liability, or Indemnification, for Consequences of Own Negligence*, 175 A.L.R. 8, 111–12 (1948). Professional bailees are treated differently than other bailees because

> the equality of bargaining power of the two parties to the [professional bailment] contract is largely theoretical in nature while actually the bailor, being in need of the services to be rendered by the bailee and usually being in no position to take his trade elsewhere, is compelled to agree to the terms stipulated by the bailee.

175 A.L.R. at 112. The rule in this state continues to be that professional bailees may not limit their liability for negligence; in every instance where a disclaimer of liability has been invalidated, a professional bailee was involved. *See Althoff v. System Garages, Inc., supra* at 864 (preprinted form used by a garageman); *Ramsden v. Grimshaw,* 23 Wn.2d 864, 866, 162 P.2d 901 (1945) (preprinted form used by a garageman); *Sporsem v. First Nat'l Bank,* 133 Wash. 199, 233 P. 641, 40 A.L.R. 854 (1925) (preprinted form for a safe deposit box); *Patterson v. Wenatchee Canning Co.,* 59 Wash. 556, 110 P. 379 (1910) (public cold storage company); *Carstens Packing Co. v. Southern Pac. Co.,* 58 Wash. 239, 108 P. 613 (1910) (common carrier); *S.S.*

*Kresge Co. v. Port of Longview, supra* (public warehouseman); *King Logging Co. v. Scalzo, supra* at 922 (common carrier).

While professional bailments are necessarily bailments for mutual benefit, not all bailments for mutual benefit are professional bailments. *See White v. Burke,* 31 Wn.2d 573, 583, 197 P.2d 1008 (1948). Bailments for mutual benefit include all nongratuitous bailments and arise when both parties to the contract receive a benefit flowing from the bailment. 8 C.J.S. *Bailments* § 16 (1988). The benefit to the bailee need not be in the form of cash. Rather, the benefit may derive from

> a bailment [which] is a mere incident to the performance of services for which the bailee receives compensation or to the conduct of a business from which the bailee derives profit, or where the bailment is motivated by the bailor's desire to promote a sale . . ..

(Footnotes omitted.) 8 C.J.S. *Bailments* § 16, at 239; *See also Burke,* at 583. Thus, bailments arising from a service transaction are bailments for mutual benefit. These bailees are not professional bailees and may validly contract to limit their liability for negligence.

Mt. Arbor is a large commercial nursery which contracted with Indian Wells individually to grow apple trees from rootstocks. Mt. Arbor was to receive compensation for the service performed upon the bailed goods, the rootstocks. Mt. Arbor and Indian Wells had equal bargaining strength, and Indian Wells was free to choose another commercial nursery for the needed service. Mt. Arbor was not a professional bailee, rather the bailment was an incident to the performance of services for which Mt. Arbor was to receive compensation. There is no rule prohibiting Mt. Arbor, as a bailee for mutual benefit, from contractually limiting its liability for negligence.

The question whether this exclusionary clause violates public policy is properly analyzed under the *Wagenblast* standards recently set forth for situations arising outside

the historically settled exceptions. *See Wagenblast,* at 851–52.

> [An] invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

(Footnotes omitted.)

*Wagenblast,* at 851–52 (quoting *Tunkl v. Regents of Univ. of Cal.,* 60 Cal. 2d 92, 98–101, 383 P.2d 441, 32 Cal. Rptr. 33, 6 A.L.R.3d 693 (1963)).

Under this test, the exclusionary clause in question is not void as a matter of public policy. Mt. Arbor did not possess a "decisive advantage of bargaining strength". *See Wagenblast,* at 851. Nor did Mt. Arbor present Indian Wells with a standard adhesion contract. Although nurseries are an important business in this state, individual members of the public do not normally require such services as a matter of practical necessity. In addition, while this transaction may put the property of Indian Wells under the control of Mt. Arbor, this characteristic is involved in every bailment and, alone, is not sufficient to void a contracted for limitation on public policy grounds. *See Wagenblast,* at 852.

Lastly, Mt. Arbor contends the trial court abused its discretion in awarding $135,000 in attorney fees to Indian

Wells. The amount of attorney fees awarded is discretionary and will only be overturned for manifest abuse. *Boeing Co. v. Sierracin Corp.,* 108 Wn.2d 38, 65, 738 P.2d 665 (1987). In determining the reasonableness of attorney fees, the following method should be employed by the trial court:

> [T]he total hours necessarily expended in the litigation by each attorney, as documented by counsel, . . . should . . . be multiplied by each lawyer's reasonable hourly rate of compensation considering *inter alia* the difficulty of the problem, each lawyer's skill and experience and the amount involved.

*Singleton v. Frost,* 108 Wn.2d 723, 733, 742 P.2d 1224 (1987); *Bowers v. Transamerica Title Ins. Co.,* 100 Wn.2d 581, 599, 675 P.2d 193 (1983). Mt. Arbor contends the record indicates only the number of hours billed which is insufficient for the trial court to calculate a reasonable fee and moves this court to supplement the record pursuant to RAP 9.11. We agree the trial court should not determine a reasonable attorney fee merely by referencing the number of hours billed. *See Sierracin,* at 65. The trial court, however, did not base the reasonableness of the fee only upon the number of hours billed. To the contrary, it found:

> Considering the complexity of this litigation, the issues of fact and law involved, the length of the trial, the expertise and standing of defense counsel in this field, the amount of the recovery, and all other factors essential to a determination of the reasonableness of attorney fees, the Court finds that *$135,000 is a reasonable sum to be awarded to defendants as and for attorneys fees.*

There is substantial evidence in the record to support this finding. We, therefore, deny Mt. Arbor's motion to supplement the record. However, because the trial court determined the reasonableness of the attorney fees, in part, by the amount of the recovery, we remand for a recalculation of attorney fees in light of the reduced recovery.

Indian Wells also seeks attorney fees on appeal. Mt. Arbor contends Indian Wells is precluded from recovering attorney fees on appeal because it failed to devote a section of its brief to a request for fees pursuant to RAP 18.1(b). However, because both parties have prevailed on

major issues, neither qualifies as the prevailing party under the contract. *See Sardam v. Morford,* 51 Wn. App. 908, 756 P.2d 174 (1988). We decline to award attorney fees on appeal.

We uphold the contract between American Nursery Products, Inc., and Indian Wells Orchards and affirm those damages assessed by the trial court under the terms of the contract. We find the exclusionary clause validly excludes incidental and consequential damages and reverse the award by the trial court of those damages. We remand to the trial court for further proceedings consistent with this opinion, including the recalculation of attorney fees.

CALLOW, C.J., and UTTER, ANDERSEN, and DURHAM, JJ., concur.

UTTER, J. (concurring)—The issue of substantive unconscionability has not been adequately addressed by the parties in their briefs. The appellant dismisses substantive unconscionability as inapplicable to commercial contracts and then directs its unconscionability argument to the process of formation of the contract. The respondent also focuses on the negotiation process in its discussion of unconscionability. Thus, as to the issue of the unconscionability of the clause excluding consequential damages, the issue raised by the case at bar is one of procedural unconscionability. The majority correctly concludes that the exclusionary clause contained in the contract between Mount Arbor and Indian Wells is not procedurally unconscionable. Accordingly, I concur in the majority's decision.

Justice Brachtenbach's dissent analyzes substantive unconscionability in terms of the possible violation of state and federal laws regarding pesticides. I have reservations whether substantive unconscionability applies to an act occurring after the contract is made. RCW 62A.2–302(1) provides that unconscionability is determined as of the time the contract was made. The parties present evidence as to the contract's commercial setting, purpose and effect.

RCW 62A.2–302(2). In determining unconscionability, the court examines the circumstances surrounding the making of the contract. *Mieske v. Bartell Drug Co.,* 92 Wn.2d 40, 50, 593 P.2d 1308, 6 A.L.R.4th 923 (1979).

There are cases supporting the position that the time of contract formation governs substantive unconscionability analysis as well as cases analyzing contracts in terms of substantive unconscionability in light of subsequent events. *Resource Mgt. Co. v. Weston Ranch & Livestock Co.,* 706 P.2d 1028 (Utah 1985), which the dissent cites presumably in support of its position, holds that substantive unconscionability is determined as of the time of the making of the contract. The court stated, "Unconscionability cannot be demonstrated by hindsight." *Resource Management,* at 1043. The court then held, "When viewed in light of the circumstances as they existed on September 21, 1974, when the instant contract was executed, we cannot say that the contract was so unfair or oppressive in its mutual obligations as to shock the conscience." *Resource Management,* at 1043–44. The court noted an exception to the general rule that substantive unconscionability is determined as of the time the contract was made. A contract that was not unconscionable at the time of formation may become unconscionable with the passage of time and thus unenforceable. *Resource Management,* at 1045. This exception is limited, however, to instances where the subsequent events were not within the reasonable contemplation of the parties at the time of execution of the contract. *Resource Management,* at 1046. The relevant inquiry is whether the alleged disparity in contractual obligations between the parties could have been foreseen during the time the contract was in force. The fact that the clause would operate to exclude consequential damages arising from a breach was surely within the contemplation of Indian Wells and Mount Arbor when they executed the contract.

In *Hershey v. Simpson,* 111 Idaho 491, 725 P.2d 196 (Ct. App. 1986), cited by the dissent, the court found that the contract was not substantively unconscionable. The court

evaluated substantive unconscionability as of the time of the making of the contract. The court held, "In the present case, the settlement agreement does not exhibit [the elements of one–sidedness, oppression and unfair surprise] when viewed *ex ante*—that is, in light of circumstances when the agreement was made." *Hershey,* at 494.

*Guthmann v. La Vida Llena,* 103 N.M. 506, 709 P.2d 675 (1985), which the dissent also cites, held that the agreement was not unconscionable. The court found that a contract is not substantively unconscionable unless the terms are grossly unfair under the circumstances as they existed at the time the contract was formed. *Guthmann,* at 511. The court then examined the circumstances existing at the time the contract was entered into and found no unconscionability. The court stated, "The doctrine of unconscionability is designed to prevent oppression and unfair surprise, and not to disturb allocation of risks because of superior bargaining power." *Guthmann,* at 513.

Thus, if a contract or clause is unconscionable, it must be so at the time the contract was made. There is no evidence that the clause excluding incidental and consequential damages was unconscionable when the parties entered into the contract.

Furthermore, substantive unconscionability of clauses excluding consequential damages is more applicable to consumer contracts than commercial contracts. In *Tacoma Boatbuilding Co. v. Delta Fishing Co.,* 28 U.C.C. Rep. Serv. 26, 35 (W.D. Wash. 1980), the court observed:

> [U.C.C.] § 2–719(3) declares that exclusions of consequential damages are prima facie unconscionable when applied to personal injuries resulting from sales of consumer goods. The Code does not specify what other types of limitations might be substantively unconscionable, but I am persuaded that, at least where only economic injury is involved, consequential damage exclusions in major commercial contracts are not among them.

(Footnote omitted.) There exists no policy against limitations of consequential damages. RCW 62A.2–719(3) (limitation of consequential damages valid unless established to be unconscionable); *Schroeder v. Fageol Motors, Inc.,* 86

Wn.2d 256, 262, 544 P.2d 20 (1975) (exclusionary clauses in commercial contracts are prima facie conscionable).

Thus, the dissent's discussion of the substantive unconscionability of the exclusionary clause may be irrelevant in the context of a commercial contract.

This discussion, while of interest in future cases, is not determinative here because the questions of whether substantive unconscionability applies to commercial contracts or to acts occurring after the inception of the contract were not squarely raised by the parties.

BRACHTENBACH, J. (dissenting)—The trial court should be affirmed. The contract is unconscionable. American Nursery Products, Inc., should not be allowed to avoid liability for its breach of contract resulting from its conduct in violation of federal and state law regulating its use of Ridomil.

It is "extremely difficult to articulate an operational definition of unconscionability." *Schroeder v. Fageol Motors, Inc.*, 86 Wn.2d 256, 259, 544 P.2d 20 (1975). The term is not defined in the Uniform Commercial Code. The difficulty affirmatively built into the legal concept may, in part, account for the majority's limited analysis of this case. The difficulty is "affirmatively" built in because the doctrine is designed to enable a court, as a matter of law, to refuse to enforce those contracts, or parts of contracts, which, in "light of the general commercial background and the commercial needs of the particular trade or case," involve clauses "so one–sided as to be unconscionable under the circumstances existing at the time of the making of the contract." Official Comment 1, RCWA 62A.2–302.

The virtually unlimited possibilities as to circumstances surrounding the formation of a contract, the characteristics of the parties and the subject matter of the agreement, and the various permutations of contract terms, including promises made, disclaimers asserted, and remedies provided and excluded, all contribute to the principle that unconscionability is not a doctrine defined by mathematically precise formulas, nor should it be.

The majority's mistake is its seizing hold of a limited "test" which it uses in an absolute sense to decide whether the contract is unconscionable.

Although the majority has engaged in too limited an analysis here, and the unconscionability doctrine wriggles free of any attempt to impose a 3–factor "test" (or a 23–factor "test," for that matter), analytical principles have been developed which guide a court in deciding, in a particular case involving particular facts and a particular contract, whether the agreement is unconscionable in whole or in part. My examination of these principles and this contract leaves no doubt in my mind that this contract is unconscionable.

As a preliminary matter, the majority correctly notes that this court has held that RCW Title 62A.2 applies to bailments arising from a service transaction, such as this one. *Mieske v. Bartell Drug Co.*, 92 Wn.2d 40, 593 P.2d 1308, 6 A.L.R.4th 923 (1979). In addition, paragraph 9.3 of the parties' agreement entitled the party declaring default to rights under the Washington Uniform Commercial Code. Further, as explained below, even if the code did not apply, the exclusionary clause would still be unconscionable and unenforceable.

I begin where the majority begins and ends, with considerations relevant to contract formation. As the court said in *Schroeder,* at 259–60, two classifications of unconscionability have generally been recognized: substantive unconscionability, which involves those cases where a contract clause or term is alleged to be one–sided or overly harsh, and procedural unconscionability, relating to impropriety during contract formation. *See* 1 J. White & R. Summers, *Uniform Commercial Code* § 4.3, at 204 (3d ed. 1988). The issues faced in *Schroeder* were whether a clause excluding consequential damages must be negotiated between the parties and set forth with particularity in a conspicuous manner, and whether these factors are relevant in a commercial transaction between businessmen. *Schroeder,* at 258–59.

The court therefore confined its analysis to matters concerning contract formation, *i.e.,* "procedural" unconscionability.

In so doing, the court stressed that unconscionability must be determined in light of all the surrounding circumstances. *Schroeder,* at 260. Moreover, the court stated that conspicuousness and negotiation, while "certainly relevant," are "not conclusive," and reasoned that, especially in a commercial transaction, prior course of dealing and usage of trade were also relevant in deciding whether the exclusion was unconscionable. *Schroeder,* at 260. The import is clear: *All* the surrounding circumstances must be examined when deciding whether unconscionability results from impropriety in contract formation.

The majority states the requirement that all of the circumstances be considered in deciding the unconscionability question, and acknowledges the course of dealing and usage of trade inquiries recognized in *Schroeder.* Then, after stating that the trial court found no prior course of dealing and no trade usage,[1] the majority analyzes three remaining factors set forth in *Schroeder* and concludes there is no unconscionability here.

This analysis is flawed. First, it ignores aspects of the surrounding circumstances which suggest impropriety in the contract formation stage. Second, the majority narrows this court's holding and rationale of *Schroeder.*

In deciding whether requirements set forth in *Berg v. Stromme,* 79 Wn.2d 184, 484 P.2d 380 (1971) apply to commercial transactions, the court in *Schroeder* said that the same public policy applicable to consumer transactions applies in commercial transactions. That is, while the parties may agree to limit remedies for breach of contract, limitations on remedies are disfavored and the Uniform

---

[1] Even if there were an industry trade practice of excluding incidental and consequential damages, its presence would not support a finding of conscionability. As explained herein, the exclusionary clause was clearly unreasonable as to Indian Wells. *See Schroeder,* at 261.

Commercial Code specifically provides for their deletion if their enforcement would deprive a contracting party of reasonable protection against breach. *Schroeder,* at 261 (citing *Chemetron Corp. v. McLouth Steel Corp.,* 381 F. Supp. 245, 250 (N.D. Ill. 1974), *aff'd,* 522 F.2d 469 (7th Cir. 1975)).

The court in *Schroeder* further stated:

> The code specifically provides for consequential damages and an individual should be able to rely on their existence in the absence of being informed to the contrary, either directly, or constructively through prior course of dealings or usage of trade.

*Schroeder,* at 262.

This language suggests that the majority incorrectly applies *Schroeder.* Indian Wells Orchards was not directly informed through discussion or negotiation about the exclusionary clause and its effect, nor was it constructively informed through prior course of dealing or usage of trade. Moreover, the majority requires a buyer at its peril to know or ascertain the legal definition and effect of RCW 62A.2–715, concerning incidental and consequential damages.

In any case, even if *procedurally* unfair aspects of this contract do not, *alone,* suffice to find the exclusionary clause unconscionable, the contract is still unconscionable. The inquiry does not end with allegedly unfair aspects of contract formation. As the court expressly acknowledged in *Schroeder,* the contract terms are also relevant to an unconscionability analysis, *i.e.,* substantive unconscionability. RCW 62A.2–719(3) provides that, outside the consumer context, a limitation of "consequential damages is valid unless it is established that the limitation is unconscionable." This court has said that "by its use of the word 'unconscionable,' RCW 62A.2–719(3) conditions the validity of an exclusionary clause on . . . RCW 62A.2–302." *Schroeder,* at 259. RCW 62A.2–302(1) states that "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract" or the

unconscionable clause or it may limit application of the unconscionable clause to avoid any unconscionable result. The section expressly contemplates substantive unconscionability as shown by the reference to a court's finding that "*the contract or any clause of the contract*" is unconscionable.

As a leading commentator has put it:

> It seems clear that the major focus of Section 2–302 is in fact on issues subsumable under the general heading of "substantive" unconscionability. Comment 1 goes to some lengths to establish a climate in which courts will feel emboldened to strike directly at contracts or contractual terms which appear too heavily weighted in favor of one of the parties . . ..

(Footnote omitted.) Ellinghaus, *In Defense of Unconscionability,* 78 Yale L.J. 757, 773 (1969).

As the court expressly said with respect to aspects of contract *formation, Schroeder,* at 260, it is apparent that the contract *terms* themselves also must be examined in light of all the surrounding circumstances and in relation to other terms. The majority has ignored the unconscionable nature of the contract terms. It may have done so on a theory that if procedural unconscionability is absent, substantive unconscionability is irrelevant. Any such theory does not justify enforcement of the exclusionary clause in this case.

Before turning to the particular facts and circumstances of this contract, and examination of its terms, a few comments are in order concerning the nature of this contract as involving a commercial transaction between businessmen. As this court has made clear, there is no prohibition in this state to finding unconscionability in a commercial transaction. In *Schroeder,* at 262, it is stated:

> [T]he single most important concept intertwined throughout the entire code is that of *good faith dealings*. The mere fact that both parties are businessmen does not justify the utilization of "unfair surprise" to the detriment of one of the parties.

The same logic applies to overly harsh or one–sided contract terms.[2]

The business nature of a contract, as well as the status of a party as sophisticated businessman or neophyte, are among the factors a court must consider in deciding the unconscionability question. While there is generally greater reluctance to finding a commercial contract unconscionable, this reluctance should not stem, and does not in this state, from mere label–based analysis. The root of the matter is that where a commercial contract is concerned, the parties often fairly share bargaining strength, sophistication about contract terms relevant to the commercial enterprise involved, and the knowledge and skill required for a contract fairly allocating risks.

Turning to the facts and circumstances of this contract, unfairness in contract formation together with unfairness in contract terms renders the contract unconscionable.

American Nursery Products, Inc. (American Nursery), is a large, well–established commercial nursery which does business throughout the United States. The northwest division of American Nursery was created in 1978 when Mount Arbor Nursery, Inc. (Mount Arbor), was purchased; this division does business as Mount Arbor Nursery. The northwest division includes approximately 800 acres of nursery plantings in Oregon and 500 acres of nursery plantings near Zillah, Washington. In contrast, at the inception of this contract, Indian Wells Orchards (Indian Wells) was a newly created limited partnership. Its general managing partner had limited experience in the orchard business and no experience as a commercial nurseryman.

In the fall of 1983, the general managing partner had an obligation to the limited partners to develop several hundred acres of land into orchards no later than 1985 and

---

[2]RCW 62A.1–203 expressly imposes an obligation of good faith.

1986. Preliminary negotiations with Mount Arbor ensued. Mount Arbor was aware of Indian Wells' nature as a limited partnership, and was aware of the general managing partner's fiduciary obligations to the limited partners.

Mount Arbor was also aware of the distinctive nature of the services required by Indian Wells. Although it had not previously entered a bailment contract of the precise sort involved here, as a large, established commercial nursery it contracted to perform specialized services tailored to Indian Wells' needs. The parties' contract involved particular rootstocks and scion wood to be provided by Indian Wells, with specialized services necessary on Mount Arbor's part. All of this was, of course, known to Mount Arbor. Thus, this situation is far removed from one where a buyer's unique or unusual needs are undisclosed to the seller. Nor is this a case in which a commercial transaction involves the purchase of fungible goods "off the shelf," or, closer to this case, the purchase of ordinary nursery stock simply grown by the nursery.

Following preliminary negotiations, American Nursery's attorney drafted a proposed contract, and later, American Nursery's attorneys drafted a second contract, which is the contract at issue here. At the bottom of page 4 of the contract, is the heading "Default; Remedies." On the next page are three paragraphs under this heading. In the middle of the third paragraph, which declares certain rights and remedies available to the contracting parties, is a clause stating "provided that in no event shall Grower [Mount Arbor] be subject to or liable for incidental or consequential damages."

The trial court found, and substantial evidence supports the finding, that this exclusionary clause was never discussed or negotiated by the parties, that it was not set forth in greater size type than the remainder of the provisions, that it was not emphasized in the agreement, that it did not set forth with particularity those matters being excluded, and that the court did not believe that Indian Wells' general managing partner had the ability to know or

understand fully the meaning of this provision. Finding of fact 5; Clerk's Papers, at 11–12.

The contract in its entirety is a mix of expressly stated glowing promises on Mount Arbor's part, and immediate negation of those promises through contractual limitations on and exclusions of remedies. The trial court quite correctly deduced that, in the end, there were no satisfactory remedies available to Indian Wells.

In paragraph 1.1 of the contract, Mount Arbor agreed to grow 700,000 apple trees for Indian Wells, specifically agreeing

> to engage in all growing and cultural practices standard within the nursery industry in attending to and caring for the Trees and to take *all appropriate and reasonable action* which, in . . . [Mount Arbor's] judgment may be necessary to grow, feed, water, cultivate, spray, cut, harvest, and *generally protect* the Trees throughout their growing cycle through harvest and until delivery to . . . [Indian Wells].

(Italics mine.) Exhibit 1, at 1.

In paragraph 3.1 the parties expressly agreed on delivery dates, with the grafted trees to be ready to harvest in the fall of 1984 and the budded trees to be ready for harvest in the fall of 1985. The latest actual delivery dates provided for in the contract were March 15, 1985, for grafted trees, and March 15, 1986, for budded trees. These ready–for–harvest and delivery dates, of course, correspond to the general managing partner's obligation to the limited partners to develop land into orchards no later than 1985 and 1986.

Under paragraph 3.4, Indian Wells bore the risk of loss following delivery of the trees to Indian Wells after they were harvested.

In paragraph 3.5, Mount Arbor excluded liability for

> any delay or failure to deliver any or all of the Trees in case such delay or failure is caused by labor disputes, strikes, war, riots, insurrection, civil disorder, fire, flood, accident, storm, act of God, inability of . . . [Mount Arbor] to obtain materials or supplies from manufacturers or deliveries in a reasonable time after bona fide attempt and order, delays in transportation,

accidents, *or any other cause beyond the reasonable control of . . . [Mount Arbor].*

(Italics mine.) Exhibit 1, at 2.

In paragraph 5.1, the contract provided that Indian Wells had 15 days from the date of delivery to reject nonconforming trees.

Paragraph 5.2 provided that as a result of Indian Wells' rejection of any trees, and Mount Arbor's acceptance of rejection, Mount Arbor had the option of replacing the nonconforming trees or reducing the purchase price.

In paragraph 9.3, the contract provided that a party declaring default

shall have all rights provided under the Washington Uniform Commercial Code and other applicable laws of the State of Washington and the terms and provisions of this Agreement . . ..

Exhibit 1, at 5. The clause excluding incidental and consequential damages followed this language.

There can be no doubt that the aim of the contract was provision to Indian Wells of healthy grafted or budded trees to be planted in an orchard and produce apples. Although paragraph 1.5 stated that no warranties, express or implied, were given which extended beyond the conditions and services set forth in the contract,[3] this paragraph could in no way diminish Mount Arbor's specific promises: to grow the trees, to take all appropriate and reasonable action during their growth, to protect the trees throughout their growing cycle, and to properly care for them after harvest and before delivery, paragraph 3.4. This is so because these specific promises were made with no explicit, particularized disclaimer of liability except as to causes "beyond the reasonable control of [Mount Arbor]." Paragraph 3.5. The general disclaimer cannot serve to negate the express contractual promises made by Mount Arbor. *See* RCW 62A.2–316; Washington Comments, RCWA 62A.2–316.

---

[3]The trial court concluded that this disclaimer was invalid.

Mount Arbor failed to keep its promise. Its negligence in dipping the rootstocks in Ridomil breached its fundamental promise to take reasonable care of the trees. Not only did Mount Arbor fail to keep its promise, it did so as a direct result of its own fault. As the trial court found, Mount Arbor's action in dipping the rootstocks in Ridomil caused injury and death to the rootstocks and grafted and budded trees. Finding of fact 20; Clerk's Papers, at 16. This finding is supported by substantial evidence.

Further, Mount Arbor's breach of contract resulted from conduct in violation of federal and state law. The clause excluding liability for incidental and consequential damages is invoked by Mount Arbor in order to avoid liability for large and foreseeable damages resulting from its unlawful conduct in violation of laws regulating pesticides.

This court should hold that the exclusionary clause is invalid as contrary to public policy. While the majority addresses the notion that exclusionary clauses may be invalidated as contrary to public policy, it never once addresses this principle in light of the violations of law which occurred in this case.

The Washington Pesticide Control Act, RCW 15.58, provides that it shall be unlawful

[f]or any person to use or cause to be used any pesticide contrary to label directions or to regulations of the director if those regulations differ from or further restrict the label directions: *Provided,* The compliance to the term "contrary to label directions" is enforced by the director consistent with the intent of this chapter . . ..

RCW 15.58.150(2)(c). Ridomil, a systemic fungicide, falls within the statutory definition of a pesticide as including "[a]ny substance or mixture of substances intended to prevent, destroy, control, repel, or mitigate any . . . fungus . . .". RCW 15.58.030(29)(a).[4]

WAC 16–228–180(1)(b) declares that "[use of] a pesticide inconsistent with [its] labeling" is a violation.

---

[4]Formerly RCW 15.58.030(1)(a). *See* Laws of 1989, ch. 380, § 1.

Under federal law, it is "unlawful for any person . . . to use any registered pesticide in a manner inconsistent with its labeling . . .." 7 U.S.C. § 136j(a)(2)(G) (1988). 7 U.S.C. § 136(ee) provides that use of a pesticide in a manner inconsistent with its label "shall not include . . . (3) employing any method of application not prohibited by the labeling . . .." The Washington act does not contain a provision comparable to the latter federal provision.

The Ridomil label did not provide for dipping the roots (or rootstocks) of apple trees. Insofar as fruit trees are concerned, the label directed, with respect to citrus (nonbearing) trees in nurseries, use of Ridomil at the time of planting and at 3–month intervals as a soil drench or as a soil surface spray (with directions for the amount of Ridomil to mix with water specified). The label directed that citrus resets or new plantings should be treated with Ridomil 2E used in a water ring drench (around the base of the tree within the watering ring) or as a soil surface spray beneath the tree canopy. As to other deciduous fruits and nuts in nursery and field plantings (with separate directions for avocados), the label directed application of Ridomil 2E (again mixed with water) "to obtain thorough coverage of the soil under the canopy of the trees. Sufficient surface area should be treated in nurseries to cover the root zone of the plants." Exhibits 34, 35.

The label contained the statement: "It is a violation of federal law to use this product in a manner inconsistent with its labeling." The label also stated: "Failure to follow directions on this label may result in crop injury . . .." The label further directed, under a subheading of "Environmental Hazards": "Apply only as specified on this label." Exhibits 34, 35.

The trial court concluded that Mount Arbor's conduct in dipping the apple trees violated both state and federal pesticide laws. Although there may be a question about whether using a dipping method as opposed to a soil drench or spray method falls within 7 U.S.C. § 136(ee)(3), the label clearly directed the user to apply the product *only* as

instructed on the label. Moreover, this section does not find a counterpart in the Washington act, which was clearly violated. Dipping the rootstocks was contrary to and inconsistent with the label directions. Several expert witnesses testified to this effect on Indian Wells' behalf.

Having determined that Mount Arbor's conduct was a violation of statutory and regulatory law relating to use of pesticides, the next inquiry is whether a clause excluding liability for such conduct is so against public policy as to call for invalidation of the clause.

In *Wagenblast v. Odessa Sch. Dist. 105-157-166J*, 110 Wn.2d 845, 851-52, 758 P.2d 968 (1988), the court concluded that factors set out in *Tunkl v. Regents of Univ. of Cal.*, 60 Cal. 2d 92, 383 P.2d 441, 32 Cal. Rptr. 33, 6 A.L.R.3d 693 (1963) are helpful in determining whether an exculpatory agreement violates public policy. The majority considers these factors here, failing, as noted, to consider them in light of Mount Arbor's violation of law.

Initially, it is clear from the decision in *Wagenblast* that there is no magic equation involving the factors which will decide whether or not an exculpatory clause is against public policy. The court did say that "[o]bviously, the more of . . . [the factors] that appear in a given exculpatory agreement case, the more likely the agreement is to be declared invalid on public policy grounds." *Wagenblast*, at 852.

Several of the factors set forth in *Wagenblast* are pertinent in this case. A nursery business engaged in performance of a contract of the sort involved here will obviously find it necessary to use various pesticides, herbicides, fungicides, bactericides, and so on. Not only is this business activity suitable for public regulation, *see Wagenblast*, at 851, 852, it is specifically regulated under the Washington Pesticide Control Act and federal laws. Moreover, care of commercial fruit trees and use of pesticides involves service of great importance to the public. *See Wagenblast*, at 851, 853. Not only is the fruit industry of great economic importance to the state, but the use of pesticides significantly affects the health, safety, and welfare of this state's

people and environment. The significance of the public interest in this matter is expressly set out in the Washington Pesticide Control Act:

The formulation, distribution, storage, transportation, and disposal of any pesticide and the dissemination of accurate scientific information as to the proper use, or nonuse, of any pesticide, is important and vital to the maintenance of a high level of public health and welfare both immediate and future, and is hereby declared to be a business affected with the public interest. The provisions of this chapter are enacted in the exercise of the police powers of the state for the purpose of protecting the immediate and future health and welfare of the people of the state.

RCW 15.58.020.

Also, while it may be that individual members of the public do not normally require nursery services as a matter of practical necessity, as the majority reasons at page 233, nurseries do hold themselves out "as willing to perform . . . [their] service[s] for any member of the public who seeks it, or at least for any member coming within certain established standards." *Wagenblast*, at 851 (quoting *Tunkl*). The contract here was not between purely private parties. Mount Arbor is part of a large commercial nursery whose services are available to a significant part of this state's public.

While other characteristics identified in *Wagenblast* may not weigh in favor of declaring the exclusionary clause as against public policy, these identified factors demand invalidation of the exclusionary clause under the facts of this case.

Many courts have found agreements exculpating liability to be against public policy where the relevant conduct was violative of statutes or regulations. *See, e.g., Dessert Seed Co. v. Drew Farmers Supply, Inc.*, 248 Ark. 858, 454 S.W.2d 307 (1970); *John's Pass Seafood Co. v. Weber*, 369 So. 2d 616 (Fla. Dist. Ct. App. 1979); *Bishop v. Act–O–Lane Gas Serv. Co.*, 91 Ga. App. 154, 85 S.E.2d 169 (1954); *Hunter v. American Rentals, Inc.*, 189 Kan. 615, 371 P.2d 131 (1962); *Warren City Lines, Inc. v. United Ref. Co.*, 220

Pa. Super. 308, 287 A.2d 149 (1971). The principle is often applied in cases where a safety statute or regulation is intended to protect the public. For example, in *Warren City Lines,* the court stated that "[a]ny attempt by a negligent party to exculpate himself for a violation of a statute intended for the protection of human life is invalid." *Warren City Lines,* at 313. Another court observed that although traditionally a plaintiff could assume a risk even where a defendant's negligence consisted of a violation of a statute, there was a trend "to the contrary where a safety statute enacted for the protection of the public is violated. The rationale is that the obligation and the right so created are public ones which it is not within the power of any private individual to waive." *Winterstein v. Wilcom,* 16 Md. App. 130, 137, 293 A.2d 821 (1972). The court in *Winterstein* characterized this trend as a refinement on the principles set forth in *Tunkl,* the case upon which this court relied in *Wagenblast.*

In light of the express public interest in regulation of pesticide use, I conclude that insofar as the exclusionary clause in the parties' contract is invoked to avoid liability for damages resulting from Mount Arbor's violation of the pesticide laws, it is invalid as against public policy.

Moreover, the clause is unconscionable. Of course, the conclusion that the clause violates public policy supports the conclusion that the clause is unconscionable: "Remedy limitation provisions may be invalidated as substantively unconscionable if they are found to be violative of public policy. This is a common result in farming states in cases involving latent defects in seed or other agricultural products." 2 R. Anderson, *Damages Under the Uniform Commercial Code* § 12.11, at 12–33 (1988).[5]

[5]The trial court concluded that the exclusionary clause was both against public policy and unconscionable. Conclusion of law 5; Clerk's Papers, at 17. The trial court further concluded that Mount Arbor could not validly exclude liability for damages resulting from its negligence, under the principle that as a bailee for mutual benefit Mount Arbor was not permitted to disclaim or limit liability for its own negligence. The parties argue this issue in their briefs. The majority reasons

The South Dakota Supreme Court concluded that a consequential damages exclusion was against public policy and unconscionable where damages resulted from conduct in violation of laws relating to pesticide labeling. *Durham v. Ciba–Geigy Corp.*, 315 N.W.2d 696, 700–01 (S.D. 1982).

In addition to violation of public policy, principles of risk allocation support the conclusion that the exclusionary clause is unconscionable. RCW 62A.2–719 expressly allows for exclusion of consequential damages. Such an exclusion is a remedy limitation, which "is obviously an allocation of risk. It relieves the breaching party from some liability for which he would otherwise be responsible and places the risk thereof on the aggrieved party." (Footnote omitted.) 2 R. Anderson, *Damages Under the Uniform Commercial Code* § 12.03, at 12–6 (1988). However, while parties may allocate risks in exercising their freedom to contract, not every allocation of risk is enforceable. RCW 62A.2–719(1) and (3) allow for exclusion of consequential damages but also provide that unconscionable exclusions of consequential damages are invalid.

The severity of loss falling in the category of consequential damages does not alone make allocation of risk of such loss to the buyer unconscionable; an exclusion of consequential damages may lead to a harsh result, but this does not render such a clause unconscionable. Eddy, *On the "Essential" Purposes of Limited Remedies: The Metaphysics of UCC Section 2–719(2)*, 65 Calif. L. Rev. 28, 44 (1977). More unfairness must be involved, therefore, than a harsh result. Other matters are relevant.

---

that the rule does not apply where a bailment for mutual benefit, as opposed to a professional bailment, is concerned.

Because the exclusionary clause is otherwise against public policy, I do not find it necessary to reach this issue. Of course, the trial court may be sustained on any theory of law established by the pleadings and supported by the proof. *LaMon v. Butler*, 112 Wn.2d 193, 201, 770 P.2d 1027, *cert. denied*, 110 S. Ct. 61 (1989); *Wendle v. Farrow*, 102 Wn.2d 380, 383, 686 P.2d 480 (1984).

The nature of the risks allocated is relevant.

One can imagine a spectrum with risks avoidable only by the seller on one end and risks avoidable only by the buyer on the other. In between fall two other classes of risks: those avoidable by both parties and those avoidable by neither. It is difficult to see what is unfair about two contracting parties shifting a risk from either class of risks in this central portion of the spectrum to one or the other party. If there is a type of risk allocation that should be subjected to special scrutiny, it is probably the shifting to one party of a risk that *only* the other party can avoid.

Eddy, 65 Calif. L. Rev. at 47.

The concept of fault is also relevant. While "fault" materializes in various ways in contractual arrangements, one way to look at a situation where fault affects performance of a contract is to "focus upon [the] narrower question of the relative ability of the parties to engage in risk–avoidance or make provisions for risk–materialization." Eddy, 65 Calif. L. Rev. at 56.

This method of addressing fault and determining whether a risk–shifting term will be declared unconscionable has been described in relation to seed cases, where mislabeled, mispackaged, or otherwise defective seeds are purchased, and, following crop failure, the purchaser sues the seed distributor. Eddy, 65 Calif. L. Rev. at 57. A limiting clause is asserted in defense; the clause usually sets a time limit for inspection of the product or excludes consequential damages. Inequality in risk avoidance arises because detection of the defect may be difficult and the seller is generally more able to detect it, and, "more significantly, the seed company has the initial opportunity to avoid risk through careful handling." Eddy, 65 Calif. L. Rev. at 57. As to risk materialization, the purchaser is generally in a worse position for financing the loss because the seeds are usually used in an all–or–nothing investment in the crop. The farmer often wins these suits. Eddy, 65 Calif. L. Rev. at 57 (see cases cited therein).

In cases involving violation of statutes, such as occurred here, risk avoidance ability and fault have been generally described:

> The widespread use of property and liability insurance does not invalidate the policy argument against contracts transferring responsibility for the violation of public safety measures enacted or authorized by the Legislature. If all that were involved was the shifting of ultimate loss from one insurer to another, we would not be concerned with the private transfer of risk by contractual agreement. It is an unescapable fact, however, that the party transferring the risk has no incentive to use reasonable care when it is held harmless for all losses resulting from its own negligence, and its insurer has no incentive to provide the transferor with loss prevention services or inspection. This creates a particularly dangerous situation for the public where (1) the party transferring the risk is better able to prevent loss or reduce the risk associated with loss, or (2) where the party to whom the risk has been transferred does not fully realize the responsibility which it has received.

(Footnote omitted.) *Warren City Lines, Inc. v. United Ref. Co.*, 220 Pa. Super. 308, 313–14, 287 A.2d 149 (1971).

Applying principles of risk allocation in light of ability to avoid risks and fault: Mount Arbor unquestionably had the initial opportunity to avoid the risk of consequential loss by careful handling of the rootstocks and lawful use of pesticides, including Ridomil. Moreover, by providing its own rootstocks and scion wood, which were healthy when received by Mount Arbor, Indian Wells had an all–or–nothing investment in the trees, and sustained losses it could not afford and which it could not adequately cover. Considering Mount Arbor's unlawful and negligent use of Ridomil, which resulted in losses it alone could have avoided, the allocation to Indian Wells of the risk of such foreseeable consequential losses was unconscionable.

The clause excluding liability for incidental and consequential damages is against public policy, is unconscionable, and should not be enforced. The loss of production damages awarded by the trial court was proper. *See* RCW 62A.2–715.

Shifting focus, now, to other remedies available under the contract, the contract specifically allowed for replacement of nonconforming trees or reduction in the purchase price, at Mount Arbor's option. The contract also provided for all rights under the Uniform Commercial Code and applicable Washington law. Despite these apparently expansive provisions, the remedies in fact were quite narrow given the circumstances and terms of the contract.

It is fundamental, as the official comment to section 2–719 states, that

> it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract.

Official Comment 1, RCWA 62A.2–719.[6]

It is clear that section 2–719(1)(a) and the official comment together contemplate that a replacement/refund remedy is usually a minimum adequate remedy and a fair quantum of remedy. Of course, a replacement/refund remedy might not allow a party the benefit of the bargain. If the two remedies are optional at the choice of the seller, the seller may opt to refund the purchase price. Instead of obtaining the benefit of the bargain, the buyer in such a case is usually simply returned to the status quo. This result is specifically permitted under section 2–719.

However, where refund is the sole remedy or the remedy selected by the seller at its option, a mere refund of the contract price may leave the buyer much worse off than before entering the contract; *i.e.,* the buyer neither obtains the benefit of the bargain nor is returned to the status quo. In such circumstances one commentator concluded that the

---

[6]This court has previously relied on the official comments to section 2–719. In *Schroeder v. Fageol Motors, Inc.,* 86 Wn.2d 256, 259, 544 P.2d 20 (1975), the court noted that "[t]he functional purpose of RCW 62A.2–719(3) is to allow the parties to allocate their risks. Official Comment 1, RCWA 62A.2–719."

provision may be facially invalid for failure to provide a "fair quantum of remedy." Anderson, *Contractual Limitations on Remedies,* 67 Neb. L. Rev. 548, 556 (1988) (discussing *Kusens v. Bodyguard Rustproofing Co.,* 23 Ohio Op. 3d 440, 33 U.C.C. Rep. Serv. 530 (Cuyahoga Cy. Ct. App. 1980), where plaintiff had his car rustproofed; the car rusted through; and a contract clause provided for a refund of price remedy which did not cover the amount of damage).

Here, of course, the replacement/refund remedy in the parties' agreement was not exclusive. The majority correctly reasons that cover and market price damages were also available. Paragraph 9.3 of the agreement granted rights under the Washington Uniform Commercial Code, and RCW 62A.2–711, .2–712, and .2–713 provide for these remedies. Nevertheless, there is a good argument to be made that the remedies provided do not constitute adequate remedies, as the trial court believed. Upon Mount Arbor's breach, it could not replace the dead or damaged trees, and Indian Wells could not fully cover for the shortage nor obtain cover in time to avoid loss of production of those trees it could cover. Despite availability of refund or market price damages remedies, Indian Wells was left much worse off than before it entered the contract. It did not have the trees for which it bargained, and it no longer had its own, special rootstocks to graft and bud in order to develop orchards by 1985 and 1986. It did not have producing apple trees by the time it could have had them had it not entered this contract with Mount Arbor.

Thus, aside from problems already discussed, there is further reason to hold that the contract unconscionably limited remedies.

As a matter of policy this contract demands close scrutiny because Indian Wells was effectively precluded from cover, having submitted a unique element of the final product which was irreplaceable and which was damaged and made useless by Mount Arbor's acts, acts in direct

contravention of its express promise to protect and provide reasonable care for the trees.

Mount Arbor's breach went to its basic performance under the contract. The remedies provisions did not adequately protect in the event of breach. Instead, they frustrated the purpose of the parties' contract. *See A&M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 186 Cal. Rptr. 114, 38 A.L.R.4th 1 (1982).

To sum up to this point: Mount Arbor was a large, commercial, experienced nursery while Indian Wells was a new limited partnership having a general managing partner with no nursery experience; Mount Arbor knew of the specialized needs of Indian Wells, and knew of the general managing partner's fiduciary obligations and the time frame for performance of those obligations; Mount Arbor drafted the agreement; the limitations as to remedies were not discussed or negotiated; the exclusionary clause was in the middle of a paragraph providing a list of available remedies to the parties under a heading of "Default; Remedies"; the general managing partner lacked the ability to understand the exclusion; Mount Arbor expressly promised to use reasonable care in performing its obligations which were at the heart of the parties' bargain; Mount Arbor attempted to exclude liability for large foreseeable consequential damages, even when those damages resulted from its violation of federal and state law and common law negligence; Mount Arbor violated pesticide laws expressly impressed with the public interest and its unlawful conduct caused the damage to the trees; Mount Arbor was the only party able to avoid the loss which occurred; and Mount Arbor's breach foreseeably left Indian Wells far worse off than it had been at the inception of the contract, given the remedies available under the contract and the clause excluding liability for incidental and consequential damages.

Two other contract provisions give rise to yet another reason to declare the contract unconscionable. Paragraph 3.4 provided that Indian Wells bore the risk of loss after delivery, and paragraph 5.1 gave Indian Wells 15 days in

which to reject nonconforming trees. Together these clauses required Indian Wells to discover defects in the trees and reject them within 15 days or forgo *all* remedies for defective or damaged trees. Thousands of trees died as a result of Ridomil damage after they were accepted by Indian Wells and planted in Indian Wells' orchards.

This case thus involves the issue of defective or damaged goods with the defect or damage being undetectable by the buyer in time to meet a short time period set for rejection of the goods. Where such latent defects are involved, courts have had no difficulty in holding the resulting exclusion of remedies invalid. *See, e.g., Kansas City Wholesale Grocery Co. v. Weber Packing Corp.,* 93 Utah 414, 73 P.2d 1272 (1937), *cited in* Official Comment 1, RCWA 62A.2–302 (as an example of the underlying basis for RCW 62A.2–302, concerning unconscionable contracts or clauses) (clause limiting time for complaints was held inapplicable to latent defects in a shipment of catsup which could only be discovered by microscopic analysis); *Trinkle v. Schumacher Co.,* 100 Wis. 2d 13, 301 N.W.2d 255 (Ct. App. 1980) (clause provided that no claims would be allowed after buyer–cut fabric imposed risk on buyer of defects discoverable only on cutting; clause held unconscionable because it denied any remedy whatsoever and therefore provided neither minimum nor adequate remedy to buyer); *Pittsfield Weaving Co. v. Grove Textiles, Inc.,* 121 N.H. 344, 430 A.2d 638 (1981); *cf. Martin v. Joseph Harris Co.,* 767 F.2d 296 (6th Cir. 1985) (the court concluded that a warranty disclaimer and remedy limitation was unconscionable, noting that a latent defect in cabbage seed which was in the seller's control to prevent was not detectable or controllable by the buyers who could lose their livelihood).

Two early Washington cases are in accord. In *National Grocery Co. v. Pratt–Low Preserving Co.,* 170 Wash. 575, 17 P.2d 51 (1932) and *Los Angeles Olive Growers Ass'n v. Pacific Grocery Co.,* 119 Wash. 293, 205 P. 375 (1922), the court held that an unreasonable time period allowed for the discovery of latent defects in purchased goods would not be

enforced to protect the seller. These cases are still sound under the Uniform Commercial Code. RCW 62A.1–204(1) provides that "[w]henever this Title requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement." Washington Comment 1, RCWA 62A.1–204 explains that the official comment contains clues to operation of section 204. Official Comment 1, RCWA 62A.1–204, states that in subsection (1) "provision is made for disregarding a clause which whether by inadvertence or overreaching fixes a time so unreasonable that it amounts to eliminating all remedy under the contract." Bringing time for rejection within the scope of RCW 62A.1–204, RCW 62A.2–602 requires that a rejection of goods must be made within a "reasonable time after their delivery or tender."

Courts have invoked section 1–204 in refusing to give effect to remedy limitations resulting from short rejection periods where latent defects in goods were not discoverable within the time allowed. *See, e.g., Wilson Trading Corp. v. David Ferguson, Ltd.,* 23 N.Y.2d 398, 244 N.E.2d 685, 297 N.Y.S.2d 108 (1968); *Neville Chem. Co. v. Union Carbide Corp.,* 422 F.2d 1205 (3d Cir.), *cert. denied,* 400 U.S. 826, 27 L. Ed. 2d 55, 91 S. Ct. 51 (1970).

The 15–day rejection period was manifestly unreasonable as to undetectable Ridomil damage which caused the death of trees after acceptance by Indian Wells. It is invalid and unconscionable under RCW 62A.1–204, .2–302, and .2–719. Further, it would be invalid even if the code did not apply. *National Grocery Co. v. Pratt–Low Preserving Co., supra; Los Angeles Olive Growers Ass'n v. Pacific Grocery Co., supra.* Damages are awardable for loss of these trees, including incidental and consequential damages, and the trial court correctly concluded that awardable damages included the cost of replanting and pulling trees damaged by Ridomil which later died.

Finally, it is necessary to address the concurrence by Justice Utter and the dissent by Justice Dore. Both adopt

the simplistic view that substantive unconscionability cannot be evaluated by events occurring after formation of a contract. This is not only contrary to common sense it is contrary to an analytical consideration of the issue. The concurrence and the dissent paste on a label and find an answer in that label.

In the first place the procedural–substantive labels "do little but add more labels to the increasing number of substitutes for analysis." Murray, *Unconscionability: Unconscionability,* 31 U. Pitt. L. Rev. 1, 21 (1969).

Second, it seems patently obvious that a clause must be construed in light of what actually happened. It will not do to look only at a clause as of the time of making the contract. "Although conceptually a clause's scope of application is established at the time of formation, practically a clause is rarely construed until a given set of circumstances has raised a dispute." (Footnote omitted.) Eddy, *On the "Essential" Purposes of Limited Remedies: The Metaphysics of UCC Section 2–719(2),* 65 Calif. L. Rev. 28, 31 (1977).

Courts which have bothered to analyze the issue conclude that it is proper to look beyond the time of formation of the contract. "Thus, the agreement must be tested as to conscionability as it is applied to the particular breach which has occurred." *Cayuga Harvester, Inc. v. Allis–Chalmers Corp.,* 95 A.D.2d 5, 20, 465 N.Y.S.2d 606 (1983). *See also Resource Mgt. Co. v. Weston Ranch & Livestock Co.,* 706 P.2d 1028, 1045 (Utah 1985); *Hershey v. Simpson,* 111 Idaho 491, 725 P.2d 196 (Ct. App. 1986); *Guthmann v. La Vida Llena,* 103 N.M. 506, 709 P.2d 675 (1985).

I would affirm the trial court.

SMITH, J., and PEARSON, J. Pro Tem., concur with BRACHTENBACH, J.

DORE, J. (dissenting)—The majority and Justice Utter in his concurrence correctly conclude that an unconscionability analysis does not render the parties' consequential damages exclusionary clause (paragraph 9.3) unenforceable.

A procedural unconscionability analysis is inapplicable to this contract between parties of equal bargaining power dealing at arm's length; a substantive unconscionability analysis is inapplicable to events occurring after the formation of the contract, *i.e.*, the Ridomil dipping.

Moreover, Justice Brachtenbach's suggestion that RCW 62A.1–204 invalidates the parties' exclusionary clause is unfounded. RCW 62A.1–204 invalidates a time limitation which is manifestly unreasonable. While this statutory provision might render the parties' 15–day notice period (paragraph 5.1) unenforceable, it has no effect on the parties' exclusionary clause (paragraph 9.3). The clause excluding consequential damages would stand.

I would hold the exclusionary clause unenforceable for still a different reason, however. Although parties are free to contractually limit remedies, including incidental and consequential damages, RCW 62A.2–719, the limitation of remedy cannot operate to deprive a buyer of all remedies for a seller's breach: there must remain "at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract." Official Comment 1, RCWA 62A.2–719. Because enforceability of the parties' exclusionary clause would leave Indian Wells without the fair quantum of remedy required by the U.C.C., I dissent.

### THE LIMITED REMEDY

When a limited remedy fails to provide the minimum relief required by RCW 62A.2–719, it fails of its essential purpose. RCW 62A.2–719(2) provides: "Where circumstances cause an *exclusive or limited remedy* to fail of its essential purpose, remedy may be had as provided in this Title." (Italics mine.) Comment 1 to RCWA 62A.2–719 explains that this subsection applies to "an apparently fair and reasonable clause", which "because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain . . .". Official Comment 1, RCWA 62A.2–719. Thus, unlike the substantive unconscionability analysis, the failure of essential purpose

analysis "'is not concerned with arrangements which were oppressive at their inception, but rather with the application of an agreement to novel circumstances not contemplated by the parties.'" J. White & R. Summers, *Uniform Commercial Code*, § 12–10, at 466 (2d ed. 1980) (quoting 1 New York State Law Revision Comm'n, *1955 Report* 584).

Applying this analysis in the instant case, it is clear that the limited remedy made available to Indian Wells failed of its essential purpose. In paragraph 1.1 of the parties' contract, Mt. Arbor agreed to grow for Indian Wells 700,000 apple trees, using "all growing and cultural practices standard within the nursing industry . . ." and taking "all appropriate and reasonable action which, in [Mt. Arbor's] judgment may be necessary to . . . protect the Trees . . . until delivery to [Indian Wells]". This statement by Mt. Arbor constitutes an express warranty.[7]

The limited remedy provided in the event of a breach of this warranty can be found in paragraph 5 of the parties' contract. Paragraph 5.1 provides in relevant part:

> Any claim made pursuant to the terms of Paragraph 1 shall be made by written notice to [Mt. Arbor] within fifteen (15) days of delivery . . .. If no written notice is received by [Mt. Arbor] within the specified period, then it shall be deemed that [Indian Wells] has received and accepted the Trees . . ..

Normally, a buyer who has accepted goods has the right to revoke acceptance upon the discovery of latent defects and to recover damages. RCW 62A.2–608. However, paragraph 3.4 of the parties' agreement provides that, after delivery, Indian Wells accepts all risk of loss to the trees. The practical effect of these contractual provisions is to deny Indian Wells any remedy for defects not discoverable within 15

---

[7]Paragraph 1.6 of the parties' contract provides: "[Mt. Arbor] warrants only that the Trees delivered to [Indian Wells] shall have a caliper size greater than or equal to five–sixteenths of an inch . . .". To the extent this statement is intended to disclaim Mt. Arbor's express warranty to use standard techniques and to protect the trees, it is invalid. RCW 62A.2–316(1). *See also Consolidated Data Terminals v. Applied Digital Data Sys., Inc.*, 708 F.2d 385 (9th Cir. 1983) (disclaimer ineffective against express warranty that a computer terminal would operate at a certain speed).

days of delivery which were caused by Mt. Arbor's failure to use standard growing practices and to protect the trees.

The trial court recognized the lack of remedy available to Indian Wells:

> [W]hen you accept this language that is in this contract right now as I read it, it just says that, "If something happens to his [*sic*] these trees, no matter what it is, we don't pay you anything." It's an all or nothing contract, quite frankly. The only thing that is in the contract as far as any remedy is concerned is, "If we don't deliver you some trees, then you don't pay us for them." That's it, period. And whatever else may have occurred or anything else like that, there is just no remedy at all . . . .. There just is no remedy, period.

Trial Judge's oral ruling, at 22 (Aug. 7, 1987).

Thus, this contract involves precisely the situation that RCW 62A.2–719(2) was intended to address. At the time the parties entered the contract, there was no reason to believe that requiring Indian Wells to make a claim within 15 days of delivery would not provide an adequate remedy for any breach of the contract. Clearly what was contemplated by the parties was the use of standard growing techniques in the development of normal trees. If such had been the case, the remedies provided by the contract would have been adequate.[8]

But standard growing techniques were not used. In the majority's own words,

> Prior to planting the grafted and the to–be–budded rootstocks in 1984, Mt. Arbor dipped the rootstocks in . . . Ridomil 2E. Ridomil 2E is considered by its manufacturer to be an extremely erratic chemical which can, and does, cause damage to rootstocks at lesser concentrations than those used by Mt. Arbor.

---

[8]For the trees that were not delivered and those that were rejected because of caliper size, the contract provided a number of nonexclusive remedies, and the U.C.C. provided still others, including cover and market price damages. Because these minimal remedies were available for other breaches, the majority concludes that a fair quantum of remedy was available to Indian Wells and, thus, there was no failure of essential purpose. What the majority ignores, however, is that *there was absolutely no remedy available for the latent defects caused by the Ridomil dipping.*

Majority, at 221. The trial court determined this rootstock dipping was not only unwise but also a violation of state and federal pesticide laws. When, as a direct result of Mt. Arbor's misuse of Ridomil, the trees died after planting, Indian Wells was left with no remedy.

Thus, an apparently fair and reasonable clause, *i.e.*, the 15-day limitation period, worked to deprive Indian Wells of the substantial value of its bargain through "novel circumstances not contemplated by the parties.'" J. White & R. Summers, *Uniform Commercial Code* § 12–10, at 466 (2d ed. 1980) (quoting 1 New York State Law Revision Comm'n, *1955 Report* 584). *See also Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 244 N.E.2d 685, 297 N.Y.S.2d 108 (1968) (in contract for sale of yarn, clause precluding claims made more than 10 days after receipt of shipment fails of essential purpose if latent defects render yarn unmerchantable); *Earl M. Jorgensen Co. v. Mark Constr., Inc.*, 56 Hawaii 466, 540 P.2d 978 (1975) (alternative remedies of refund and repair/replacement fail because latent defects caused additional damages).

### THE EXCLUSIONARY CLAUSE

Although this court has never reached the question,[9] I conclude that the failure of the limited remedy available to Indian Wells requires the invalidation of the exclusionary clause in this case:

> Section 2–719(2) states in unequivocal terms that when an exclusive [or limited] remedy fails, "remedy may be had as provided in this Title." The comment also states that a remedy that fails "must give way to the general remedy provisions of this Article." Those general remedy provisions include consequential damages. Accordingly, most courts have held that failure of the limited remedy causes the clause excluding consequential damages to fail also.

---

[9]*But see Fiorito Bros., Inc. v. Fruehauf Corp.*, 747 F.2d 1309 (9th Cir. 1984) (applying Washington law to invalidate exclusionary clause for failure of limited remedy) and *Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co.*, 709 F.2d 427 (6th Cir. 1983) (applying Washington law and reaching opposite result). The Ninth Circuit in *Fiorito Bros.*, at 1314, specifically declined to follow the Sixth Circuit's opinion in *Lewis Refrigeration Co.*

(Footnotes omitted.) Roth, *To Have and Have Not: The Application of U.C.C. § 2–719 to Clauses Limiting Remedy to Repair or Replacement and Excluding Liability for Consequential Damages in Commercial Contracts,* 2 U. Puget Sound L. Rev. 289, 307 (1979).

This result is consistent with the policies of the code and the clear intentions of the parties. Indian Wells paid the purchase price to get trees that were grown as warranted and agreed to forgo consequential damages in return for the remedies it would be provided when it notified Mt. Arbor of defects within 15 days of delivery. When Mt. Arbor, by dipping the rootstocks in Ridomil, caused latent defects which were not visible within the 15–day period, Indian Wells lost the benefit of its bargain because it then had to bear more consequential damages than bargained for, *i.e.,* removal and replanting of trees and production losses. *See* Roth, 2 U. Puget Sound L. Rev. at 309.

Indian Wells is entitled to recover all of the consequential damages the trial court found Indian Wells properly proved:

> Because it would be difficult to partition the final consequential damages into an amount . . . which the buyer should bear, and an amount . . . which the seller should bear, the Code indicates that the total loss should be borne by the seller. After all, the seller contracted to be in the active position and always had the option of limiting liability by [ensuring the success of the limited remedy].

(Footnotes omitted.) 2 U. Puget Sound L. Rev. at 309–10.

Indian Wells incurred substantial consequential damages, including removal and replanting costs and production losses as a result of Mt. Arbor's misuse of the Ridomil. Because of the difficulty in partitioning these damages into amounts which should be borne by either party, Indian Wells should recover all the consequential damages awarded it by the trial court.[10]

---

[10]Justice Brachtenbach cites cases in which a contract or contract provision has been held unconscionable under RCW 62A.2–302 because latent defects caused a remedy to fail of its essential purpose under RCW 62A.2–719. *See, e.g., Trinkle v. Schumacher Co.,* 100 Wis. 2d 13, 301 N.W.2d 255 (Ct. App. 1980). I

## Conclusion

Justice Dolliver's majority opinion focuses primarily on the conscionability of the parties' consequential damages exclusionary clause, paragraph 9.3 of the contract. He upholds the clause as conscionable because it was entered into by parties of equal bargaining power dealing at arm's length.

I agree that parties are free to contractually limit available remedies. However, a party cannot contract away all liability for damages caused by its own negligence. This is where Justice Dolliver and I disagree. Justice Dolliver declines to apply the failure of essential purpose doctrine to invalidate the exclusionary clause because he believes adequate remedy is provided Indian Wells by the contract even if the exclusionary clause is enforced. Specifically, he maintains, Indian Wells may recover its cover costs, the estimated value of trees short which could not be covered, and the price of the Belgian rootstocks purchased by Mt. Arbor but not paid for less the contract cost avoided for trees that were not delivered. What Justice Dolliver ignores is that there is absolutely no remedy available to Indian Wells for the latent defects not discoverable within 15 days. This *complete lack of remedy contravenes both the U.C.C. and public policy* for the law does not permit a party to insulate itself from its own negligence.

---

would decline to follow these cases. The unconscionability and failure of essential purpose doctrines are distinct, and confusing them, as in these cases, is unwise. Because the unconscionability analysis applies as of the date of the contract's formation, it must be the mere *potential* for latent defects that causes a limited remedy to fail under an unconscionability analysis. This analysis logically exposes any contract with the *mere potential* for latent defects, *i.e.,* virtually every sales contract, to the risk of being declared unconscionable at its inception regardless of whether the limited remedy actually fails! This gives a buyer an unbargained–for advantage.

The unconscionability analysis applies to circumstances existing as of the contract's formation. The failure of essential purpose analysis applies to events occurring after formation, such as the Ridomil dipping. I would refrain from confusing the two.

Justice Brachtenbach in his dissent would hold the exclusionary clause unconscionable because Mt. Arbor dipped the trees in Ridomil in violation of state and federal pesticide law. He would uphold the trial court's award, including the award of consequential damages. Although I believe Justice Brachtenbach reaches the correct conclusion, his analysis is faulty. The unconscionability analysis is simply inapplicable to events that occurred *after* the formation of the contract, *i.e.,* the Ridomil dipping. *See* RCW 62A.2–302 and Official Comment 1, RCWA 62A.2–302. The proper analysis is the failure of essential purpose analysis.

In sum, I would uphold the trial court's entire award of $2,081,854 because of the failure of the limited remedy made available to Indian Wells. Enforcing the clause leaves Indian Wells with no remedy for the latent defects caused by the Ridomil dipping. This result is simply not permitted by the U.C.C. or by public policy which prohibits a party from insulating itself from liability for conduct caused by its own negligence.

Reconsideration denied January 9, 1991.