[No. 27660-3-I.   Division One.   May 11, 1992.]

JAMES A. CARSON, ET AL, *Respondents,* v. ROBERT WILLSTADTER, ET AL, *Appellants.*

*Scott B. Osborne, Marisa V. Lindell,* and *Graham & Dunn,* for appellants.

*Ted Zylstra* and *Zylstra, Beeksma, Waller & Skinner,* for respondents.

SCHOLFIELD, J. — Robert and June Willstadter appeal a decree partitioning real property held in common with James and Mary Lou Carson, contending the trial court erred in failing to base its partition on the present value of the resulting parcels, and the award of owelty was miscalculated as a matter of law. We remand.

## FACTS

In 1967, the Willstadters and Jim Carson purchased an undivided parcel of land on Whidbey Island as tenants in common. Mr. Carson later conveyed a community interest to his wife. In 1989, the Carsons filed an action for partition.

The property is a strip of land 2,400 feet long (east-west) and 550 feet wide (north-south) fronting Admiralty Inlet. The waterfront portion of the property (550 feet) on its western border lies at the bottom of a steep bank, and the bank is about 200 feet east of the shore. North of the parcel is a subdivision with four potential access roads: Driftwood

Way, Fircrest Avenue, Pinecrest Avenue, and Virginia Avenue.

After the complaint was filed, the court appointed three referees to recommend a partition of the property. The referees met, visited the property, and issued a report that recommended the property be divided in half along its length (running east-west) because of the property's topographical north-south consistency. The referees determined the northern half to be more valuable because of improvements located there, and it had ready access to the four roads from the north. The referees recommended easements across the northern parcel, as the southern parcel would otherwise be left without access, and a payment be made to compensate the owners of the southern parcel for the improvements on the northern parcel.

At trial on November 8, 1990, the chairman of the referees, Mr. Fakkema, stated:

> [W]hen one looks at value on this particular piece of property, one really has to look at potential value. . . .
>
> The potential value once the sewer problems are resolved — and currently the technology is there — but the economics are yet to be there — really demand that one look at the overall property under future subdivision rules and regulations. And if one were to look at the southerly piece of property and submit it to any governmental agencies, particularly Island County for subdivision and for review, it becomes apparent that the county is going to have some definite requirements regarding access. . . .
>
> . . . .
>
> . . . [I]f off-site sewer treatment were available, the site could be developed into several units, condominium units, or even single family units.

At the close of trial, the trial court awarded the Willstadters the northern parcel and the Carsons the southern parcel. In its findings of fact, the trial court determined that the two halves would have equal value (not including the improvements) by granting a 60-foot-wide extension of Virginia Avenue south, and a 40-foot-wide extension of Driftwood Way running south "along the toe of the bank" to the northern border of the southern parcel. Finding of fact 10.

The court determined that the costs of constructing both of these easements are to be borne by the owner of the southern parcel, and the extension of Virginia Avenue may be dedicated to the county at option of the owner of the southern parcel.

The trial court also granted a 60-foot-wide easement running east-west along the center line of the border between the two parcels, from the high bank on the west to the extension of Virginia Avenue on the east, to benefit both properties. If either owner elects to construct this road to the standards of Island County, the cost is to be shared equally, and either party may elect to dedicate it to the county.

The court found that the residence, outbuildings, and water well on the northern parcel were worth $40,000, and awarded $40,000 in owelty to the owner of the southern parcel. This appeal followed.

### THE TRIAL COURT'S PARTITION OF THE PROPERTY

[1, 2] Partition of property owned in common is an equitable remedy in which the court has great flexibility in fashioning relief. *Leinweber v. Leinweber*, 63 Wn.2d 54, 385 P.2d 556 (1963). Partition may occur "according to the respective rights of the persons interested therein . . .". RCW 7.52.010. The court may appoint three referees to determine the rights of the owners.

> In making the partition, the referees shall divide the property, and allot the several portions thereof to the respective parties, quality and quantity relatively considered, according to the respective rights of the parties as determined by the court . . . The referees shall make a report of their proceedings . . ..

RCW 7.52.090. The court may confirm or set aside the report in whole or in part. RCW 7.52.100. A presumption exists in favor of the trial court's findings of fact, and the party claiming error has the burden of showing the findings are not supported by substantial evidence. *Thor v. McDearmid*, 63 Wn. App. 193, 204, 817 P.2d 1380 (1991).

Here, the referees were directed by the trial court to partition the property in half, "quality and quantity relatively considered". Although no Washington courts have specifically stated that the respective values between the resulting parcels are to be determined *at the time of partition,* common sense and Washington authority suggests this to be the case. In reviewing a partition action, the court in *Hegewald v. Neal,* 20 Wn. App. 517, 526, 582 P.2d 529, *review denied,* 91 Wn.2d 1007 (1978) cited with approval the trial judge's refusal to consider substantially higher potential values of the property to be partitioned, "because they were not present values." The present value of a piece of property is its fair market value: "Fair market value has been defined as the price which a 'well-informed buyer' would pay to a 'well-informed seller,' where neither is obliged to enter into the transaction." *State v. Sherrill,* 13 Wn. App. 250, 255, 534 P.2d 598, *review denied,* 86 Wn.2d 1002 (1975). It follows that in the event a parcel's value is largely determined by whether it may be subdivided, both a well-informed buyer and seller would consider a property's subdividability in agreeing upon a fair market price.

Here, the question of whether either of the parcels could be subdivided is very important; if it is unknown how many subparcels could be created out of the two halves, then any well-informed buyer and well-informed seller would take into consideration the respective probabilities, balancing the chance of subdivision against the possibility that no subdivision would be allowed. The less the likelihood of subdivision on the northern parcel, the greater the effect the easements across it would have. If the northern parcel did not pass a "perc" test, for example, and the southern one did, the northern parcel could be faced with substantial traffic on the three easements, though would itself only be able to support a few dwellings.

Q: If those two streets were thus extended across the north half . . ., does that have any adverse effect on the value of the north half of the property?

A: [by Mr. Fakkema] Not from a subdivision standpoint, no. It depends on what it would be used for. If one person wanted

to occupy the entire north half without any subdivision of the property, it would obviously impact their land use. It would be separate parcels separated by roads.

Here, the referees partitioned the property on the assumption that the northern parcel would be subdividable:

Q: Your proposal as to access and easements is all predicated upon the assumption that the property is going to be subdivided; is that correct?
A: Um-hmm.

This assumption manifested itself in the number and size of the easements, which were of a width to comply with county standards (apparently to handle volume traffic). However, Mr. Fakkema stated that under present conditions subdivision would be unlikely:

The existing value is somewhat limited, soil conditions are rather restrictive. One might have one or two residential building sites on the property; but really with today's conditions, that's about what you're going to have without some off-site sewer treatment capability.
. . . .
Q: You mentioned that the soil's conditions in the property, from your experience, are not good. Did you have access to any perc tests or any similar soil studies?
A: Soil studies, SCS studies, Soil Conservation Service.
Q: What do those studies indicate to you?
A: Very restricted.
Q: And given that restriction, you might be able to get, what, one or two houses on the parcel now?
A: Possibly a few more. But under today's regulations and the soil test, if you had to rely on on-site sewage disposal, it would be very limited. . . . .
Q: And your feeling is that though in the future, that with subdivision, you might be able to overcome or improve techniques, I guess, in sewage disposal, overcome these soil conditions?
A: Yes. With growth demands. And we're seeing this all over Whidbey Island. Ultimately, Bon Air, Ledgewood Beach, Teronda, that entire area will probably be a sewer district, and off-site sewage treatment capability should be there.

Mr. Fakkema stated that the area will *probably* be in a sewer district (suggesting subdividability), but also that "with today's conditions" only a few houses would be supported on each parcel. As a matter of economic theory, fair

market value of the parcels at the time of partition would balance between these two possibilities. To the extent that the northern parcel is not subdividable, the easements crossing it would diminish its value by breaking the parcel up.

In recommending the partition, the trial court improperly assumed the parcels would be subdividable, when by the referee's own testimony they may not be. Accordingly, we find the trial court's partition is not supported by substantial evidence. Because the impact of subdivision so materially affects the fairness of the partition, and because fair market value necessarily takes into consideration present uses and speculative future uses, we remand to determine the relative present fair market values of the two parcels, recognizing the necessity of the two easements that cross the northern parcel. If there is a difference in the appraised values (and there may not be, given the advantage the northern parcel has in its proximity to utilities and access), owelty, or the common border, may be adjusted accordingly. Additionally, if it is determined there is little chance for a subdivision, the easement running along the boundary between the two parcels appears to be an unnecessary burden against the northern parcel.

## OWELTY

Owelty is money paid in the event of an unequal partition of real property. *Hartley v. Liberty Park Assocs.*, 54 Wn. App. 434, 438, 774 P.2d 40 (1989).

Here, the trial court stated in an unchallenged finding: "There is situated on the North one-half of the property residence dwelling, outbuildings and a water well. The value of those improvements is $40,000." Finding of fact 7. From this finding the trial court concluded the defendants should pay owelty to the plaintiffs of $40,000.

■ Appellate review of a conclusion of law based on findings is limited to determining whether the findings support the conclusion. *American Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 222, 797 P.2d 477 (1990).

Here, the conclusion that owelty should be $40,000 is not supported by the finding that there is a disparity in value between the two parcels of $40,000. The disparity of $40,000 can be corrected by requiring a payment to the Carsons of $20,000, or one-half the disparity. Appellants then have the improvements less $20,000. Accordingly, the award of owelty in the amount of $40,000 must be reversed.

The judgment is reversed and remanded to the trial court for repartition in accordance with this opinion.

GROSSE, C.J., and COLEMAN, J., concur.